# EXHIBIT 9

# REPORT ON TICKET RESELLING AND ARTICLE 25 OF THE ARTS & CULTURAL AFFAIRS LAW

NEW YORK STATE DEPARTMENT OF STATE
1 COMMERCE PLAZA
ALBANY, NEW YORK 12231
518-486-9846

HON. LORRAINE CORTÉS-VÁZQUEZ
SECRETARY OF STATE

February 1, 2010

## INTRODUCTION

Pursuant to Chapter 68 of the Laws of 2009, the Department of State ("Department") submits to the Governor, Temporary President of the Senate, Speaker of the Assembly, and minority leaders of each house of the Legislature the following report regarding the effectiveness of the regulation of the resale of tickets to places of entertainment under Article 25 of the Arts and Cultural Affairs Law.

To meet the statutory objectives, the Department conducted interviews with ticket resellers, venue operators, event promoters and operators of third-party platforms that facilitate resale transactions between parties, and consulted with the New York State Consumer Protection Board. In addition, the Department examined complaints it received since 2007 when it began licensing ticket resellers. Finally, the Department conducted a comprehensive analysis of ticket prices and their availability for popular events on both the primary and secondary markets. This analysis included performances by the same artist, and performances billed under the same title, that were held in New York as well as several nearby states, all with varying statutory governance of resale. The data and methodology are included in Appendix C of this report.

The statutory history of controlling the resale of tickets to places of entertainment dates back to the 1920s. Since that time, the findings of the Legislature, and the resulting intent, has undergone a substantial transformation. While it was stated by previous legislatures that "the price of or charge for admission" to places of entertainment was a matter of public interest[1], more recent legislatures have set forth that "transactions involving tickets for admission to places of entertainment" are the subject of public interest as it relates to "safeguarding the public against fraud, extortion, and similar abuses."[2] While not in conflict with one another, these legislative findings do indicate a change in attitude concerning the public interest and the subsequent action the legislature should take to protect the same. The shift away from controlling prices on the secondary market coincides with the logic that absent price controls on the primary market, the affordability of a ticket can never truly be guaranteed.

---

[1] L.1922, c.590.
[2] L.2007. c.61

It is significant that the current statute is accompanied by an effectively dormant statute to which the law would revert absent legislative action[3] (see Appendix B for full text). A willingness to allow such a reversion would speak to a fundamental change in thinking about defining the public interest. The potential for this reversion has drawn opposition from nearly all affected stakeholders over the last decade, and has resulted in regular extensions and modifications to the law about every two years during that time.

With that in mind, the Legislature prescribed a series of nine topics on which they asked the Department to focus. The findings and recommendations included herein are the result of that effort. We note, however, that these recommendations are the product of an analysis that was hampered by the Department's inability to compel any segment of the industry to produce valuable ticket sales and availability information on either the primary or secondary markets. Thus, the Department was reluctant to draw conclusions in cases where such would be based on only anecdotal information. We have endeavored to identify in this report when such is the case.

---

[3] For the complete statute, see Appendix A.

## The Use of The Internet to Sell Tickets

In the last decade, the internet has dramatically impacted the ticket industry, both the primary market and the secondary market. There are many websites that sell tickets and it is often difficult to determine whether the site is offering tickets from a primary market agent, a licensed ticket reseller, or from an unlicensed reseller. Resellers use the internet both to purchase and resell tickets. Most resellers do not maintain their own websites for the purpose of reselling tickets to consumers. Rather, resale primarily occurs on resale websites, such as Stubhub.com, which act as platforms for ticket resellers to advertise and sell available tickets. These sites do not have an ownership interest in the tickets being sold and act merely as a virtual marketplace. This appears to be in contrast to the industry as described in 1999 when an investigation by the Office of the Attorney General found that kickbacks, fraud and secretive dealings were the norm in the resale industry.[7] Since that time, the trend nationwide has been toward internet sales and deregulation; many states, including New York, have amended their laws to remove price-caps in order to "permit a free market to work its magic."[8] While illicit schemes to obtain premium tickets still exist, the ticket resellers who met with the Department described a myriad of legitimate ways in which they obtain tickets for resale. Some ticket resellers are members of fan-clubs and other pre-sale promotion groups which are offered tickets before they are released to the general public. Resellers may also purchase season tickets and box seats that guarantee them a source of tickets to resell to the public. Resellers also employ large numbers of employees who purchase tickets by use of telephones and computers. Others use computer systems and programs that invade primary market websites and unfairly obtain tickets to the detriment of the general public.

Some resale websites provide a level of protection to consumers. For example, Stubhub.com claims that it utilizes antifraud tools to ban abusive resellers from its site and provides a "Fan Protect Guarantee," whereby Stubhub tracks the package, confirms delivery and

---

[7] Office of the Attorney General, Bureau of Investor Protection and Securities, Why Can't I Get Tickets? Report on Ticket Distribution Practices, May 17, 1999.
[8] Nicholas Confessore and Danny Hakim, Albany Close to Agreement to Ease Ticket Resale Limits, NYTimes, May

- 10 -

follows up with the seller if there is a problem. Ticketnetwork.com also reported that it utilizes internal policies to restrict fraud and other abuse by ticket resellers, and that it imposes sanctions for violations of this policy, including fines and banning abusive resellers. Similarly, Ticketmaster reported that it employs protections for consumers on its resale website, Ticketsnow.com, including banning certain resellers from advertising tickets for sale.

### The Current Law

Article 25 of the Arts & Cultural Affairs Law contains the provisions regulating the resale of tickets in New York. Section 25.01 declares that oversight of the transactions for the purchase of tickets to places of entertainment is a public interest and that enforcement of the article's provision extends to all businesses that sell tickets to entertainment that occurs within New York's boundaries. Section 25.07 requires that ticket resellers refund the purchase price under certain conditions, such as the cancellation of the event. Section 25.09 provides that "[a]ny person who in violation of section 25.13 (licensure provision) of this article unlawfully resells or offers to resell or solicits the purchase of any ticket to any place of entertainment shall be guilty of ticket speculation." Section 25.13 provides for the licensing of ticket resellers by the Department of State. Website platforms that facilitate ticket resale, but do no engage in the resale itself, are exempted from licensure requirements under section 25.13.[9]

Section 25.17 of the Arts & Cultural Affairs Law permits the Department to request information from licensed ticket resellers and places of entertainment about said licensee or promoter's business, business practices and business methods, when the request is related to a complaint. The statute does not grant the Department subpoena power or other general authority to compel the production of material and records to monitor the industry. As such, in preparing this report, the Department was confined by the limited authority given by statute and relied on that material which the Department obtained through its independent research and that which was voluntarily produced by industry representatives.

---

31, 2007, quoting former Governor Eliot Spitzer.

[9] See, Communications Decency Act, 47 U.S.C. sec. 230.
