# REPORT ON TICKET RESELLING AND ARTICLE 25 OF THE ARTS & CULTURAL AFFAIRS LAW

**NEW YORK STATE DEPARTMENT OF STATE
1 COMMERCE PLAZA
ALBANY, NEW YORK 12231
518-486-9846**

**HON. LORRAINE CORTÉS-VÁZQUEZ
SECRETARY OF STATE**

**February 1, 2010**

## INTRODUCTION

Pursuant to Chapter 68 of the Laws of 2009, the Department of State ("Department") submits to the Governor, Temporary President of the Senate, Speaker of the Assembly, and minority leaders of each house of the Legislature the following report regarding the effectiveness of the regulation of the resale of tickets to places of entertainment under Article 25 of the Arts and Cultural Affairs Law.

To meet the statutory objectives, the Department conducted interviews with ticket resellers, venue operators, event promoters and operators of third-party platforms that facilitate resale transactions between parties, and consulted with the New York State Consumer Protection Board. In addition, the Department examined complaints it received since 2007 when it began licensing ticket resellers. Finally, the Department conducted a comprehensive analysis of ticket prices and their availability for popular events on both the primary and secondary markets. This analysis included performances by the same artist, and performances billed under the same title, that were held in New York as well as several nearby states, all with varying statutory governance of resale. The data and methodology are included in Appendix C of this report.

The statutory history of controlling the resale of tickets to places of entertainment dates back to the 1920s. Since that time, the findings of the Legislature, and the resulting intent, has undergone a substantial transformation. While it was stated by previous legislatures that "the price of or charge for admission" to places of entertainment was a matter of public interest[1], more recent legislatures have set forth that "transactions involving tickets for admission to places of entertainment" are the subject of public interest as it relates to "safeguarding the public against fraud, extortion, and similar abuses."[2] While not in conflict with one another, these legislative findings do indicate a change in attitude concerning the public interest and the subsequent action the legislature should take to protect the same. The shift away from controlling prices on the secondary market coincides with the logic that absent price controls on the primary market, the affordability of a ticket can never truly be guaranteed.

---

[1] L.1922, c.590.
[2] L.2007. c.61

- 2 -

It is significant that the current statute is accompanied by an effectively dormant statute to which the law would revert absent legislative action[3] (see Appendix B for full text).   A willingness to allow such a reversion would speak to a fundamental change in thinking about defining the public interest.  The potential for this reversion has drawn opposition from nearly all affected stakeholders over the last decade, and has resulted in regular extensions and modifications to the law about every two years during that time.

With that in mind, the Legislature prescribed a series of nine topics on which they asked the Department to focus.  The findings and recommendations included herein are the result of that effort.  We note, however, that these recommendations are the product of an analysis that was hampered by the Department's inability to compel any segment of the industry to produce valuable ticket sales and availability information on either the primary or secondary markets. Thus, the Department was reluctant to draw conclusions in cases where such would be based on only anecdotal information.  We have endeavored to identify in this report when such is the case.

---

[3] For the complete statute, see Appendix A.

# EXECUTIVE SUMMARY

**Findings and Recommendations in the Report Include:**

1.      **While there are public benefits to requiring disclosure of the number of tickets withheld from the general public, there are also potential public costs which should be taken into consideration.**

The Department determined that the use of concert holds appears to be a widespread and customary practice in the entertainment industry.  The average consumer is unaware that numerous tickets are withheld from public sale and that this practice diminishes the likelihood of obtaining a quality ticket at the initial box office price.  Requiring disclosure of hold tickets might benefit consumers by preventing unrealistic expectations about ticket availability and by better informing their decisions about purchasing tickets from within the available supply, but it would not appreciably affect their ability to gain access to events they wish to attend.  Disclosing this information might also decrease the likelihood of fraud and illicit dealings between those having access to tickets at the time of initial sale and those seeking to purchase tickets for resale, but such would be dependent upon consumer diligence in comparing tickets available on the secondary market against tickets that were initially offered for public sale.

Requiring public disclosure might also place New York venues at a competitive disadvantage to venues in other states.  To artists and promoters seeking to protect information about the dissemination of their tickets, New York venues could become less desirable.  If this occurs there could be corresponding economic impacts not only on New York entertainment venues, but on restaurants, hotels and other businesses that derive profits from entertainment events in New York State.  Further, there are valid concerns about the degree to which public disclosure requirements might interfere with private contracts between artists, promoters, ticketing agents and venues.

It seems instead that certain disclosure through regulatory enforcement might be more valuable to track the flow of tickets to the secondary market and uncover criminal violations.

This would more readily coincide with the legislative intent to safeguard the public against fraud and extortion in ticket transactions.

2.   **Ticket speculation and the criminal diversion of tickets to the secondary market harms the public and damages the reputation of the ticket industry in New York State.**

The diversion of tickets from general sale by persons who have access to tickets before the time of initial public sale- known as "ICE"- has been identified as a problem in the ticket industry.  Furthermore, ticket speculation, which is the resale of tickets above their face value by an unlicensed reseller, is also a contributing factor that injures the reputation of the industry.

As with the use of holds, obtaining specific information about these practices was limited by the Department's inability to compel disclosure.  While both practices may have diminished due to the evolution of the ticket industry, and the legitimization of resellers through a licensing scheme and the free-market expansion, it was determined by the Department that issues of ticket speculation and illegal diversion will likely always exist.  The prevention of these practices is a laudable goal and current laws against them should be vigorously enforced.

3.   **The Department finds no conclusive evidence that the existence of price caps affects ticket availability or price on the primary or secondary market.**

In comparing the availability and cost of tickets in New York State with that of other states where price caps in the secondary market are in effect, the Department failed to establish any causal connection between the existence of price caps and the availability and cost of tickets on the primary and secondary market.  Price and availability of tickets on the secondary market appeared to be largely driven by market forces and prices on the secondary market were generally more expensive than the initial list price.  The Department further determined that the removal of the price cap in New York has not prevented tickets to popular events from selling out quickly and has not prevented tickets from reaching the secondary market before tickets are released to the general public.  The Department's research determined that even in those states with a price cap on resale, the caps are largely ignored on the secondary market.

Instead, the Department concludes that the most relevant factor in determining the price of a ticket on the secondary market is the degree to which the price on the primary market reflected the actual market value of the ticket.  The establishment of ticket prices on the primary market that are below the true market value of such tickets in fact creates the opportunity for speculation and subsequent markups on the secondary market.

**4.     Article 25 of the Arts & Cultural Affairs Law should be amended to provide for better enforcement of existing penalties.**

Section 25.17 of the Arts & Cultural Affairs law authorizes the Department to conduct investigations and obtain information and documentation from licensees.  The statute, however, limits the scope of Departmental investigations to the content of the complaint which initiated the investigation. The statute should be amended to authorize the Department to investigate any violation of the statue or regulation and to permit inspections and audits of business records and contracts related to both the primary sale of tickets, and activity on the secondary market. Without such latitude, the Department will continue to be constrained from investigating potential violations of the public interest as established by the Legislature.

Currently, websites that serve as a resale platform to resell tickets between third parties and do not in any other manner engage in resale of tickets are exempt from registration.  (Section 25.13).  These sites are also exempt from complying with requests from the Department of State insofar as only licensees and operators of places of entertainment are obligated to provide the Department with information and documentation. (Section 25.17).  To allow the Department to effectively investigate existing statutory violations and analyze the flow of tickets onto the secondary market, thought should be given to amending the statute to authorize the Department to request information from these online resale sites.  The Department recognizes that there are jurisdictional constraints to enforcement as it relates to out of state entities.

Article 25 of the Arts & Cultural Affairs Law currently requires licensed ticket resellers to file a bond with the Department of State.  The statute should be amended to make it easier for the Department to levy the bond for unpaid fines and restitution. Such an amendment would avoid the need for the Department to commence an action in state court to levy the bond.

**5.    Computer programs and auto-dialing phone systems impact the availability of tickets and provide users with an unfair advantage in purchasing tickets from the primary market.**

The use of computer programs and auto-dialing phone systems enable users to quickly purchase large blocks of tickets from the primary market. The use of these devices also results in damage to computer systems and requires significant resources to repair system damage and to combat attacks.  Other states have enacted or proposed legislation to ban the use of these devices. New York should consider doing so as well.

**6.    An unregulated secondary market results in public costs and benefits.**

One of the greatest benefits in removing the price caps has been the legitimization of the ticket resale industry, providing business and employment opportunities for New York residents. These legitimate businesses also contribute to the State's economy.

The ticket resale market allows consumers unable to attend an event for which they have tickets to recoup their costs by selling the tickets to another consumer.  Additionally, the secondary market provides a valuable service to tourists and visitors willing to pay a premium to purchase high-quality tickets to events on short notice.  In fact, the resale market provides significant benefits to the hotel industry, which uses concierge-procured tickets as a selling point. In most cases, the secondary marketplace also offers a safe alternative to unlicensed street-based scalpers, against whom consumers have no recourse when sold fraudulent tickets.  Any system that further restricts street scalping is typically viewed by local law enforcement as a positive benefit.

However, the secondary market also provides a forum to capitalize on gaps between the face value of a ticket and its actual market value.  The practice of assigning prices below market value creates a significant financial incentive for persons willing to speculate on tickets, as well as employees within the system looking to divert tickets to the secondary market for a fee.  The secondary market itself acts only as the forum within which speculators and brokers can resell tickets at their actual market value.  The high potential profit margins are the financial incentive that catalyzes competition for tickets on the primary market.  This same phenomenon is equally responsible for the criminal diversion of tickets to the secondary market.

- 7 -

For the consumer, this all makes obtaining a ticket at list price more difficult.  In general, particularly for popular and sold-out shows, purchasing a ticket from a ticket reseller results in the consumer paying more for the ticket.  But statutorily capping prices on the secondary market has been shown to have little effect in New York and other states.  Issues relating to interstate commerce complicate, and sometimes frustrate enforcement efforts.  Further, were price controls to be effectively enforced in New York, the net effect would be that tickets would simply be resold to consumers outside of New York at a premium, further depriving New York consumers of access to ticket to events that they wish to attend.

7.    **While there would be a public benefit to publishing the average price of tickets after an event takes place, such a requirement would be difficult to execute.**

Publishing the average price of tickets for an event after the event takes place provides some public benefit by giving information on which to base future purchasing decisions.  However, knowing the average price of a ticket to one event would likely provide limited useful information to a consumer trying to get tickets to another event.  In addition, to be most useful, a publication requirement would encompass data from both the primary and secondary markets and it is unlikely that secondary resellers and the primary market would be willing to provide price data to each other.  Finally, publication by a state agency or other governmental unit would create challenges from a resource perspective and would require jurisdiction over primary and secondary sellers to compel the production of the needed data.

## SECTION I
## The Ticket Selling Industry

New York is home to a wide variety of world renowned entertainment: from Broadway to opera and ballet in New York City; concerts at Nassau Coliseum; sporting events at Ralph Wilson Stadium; and many other sporting and concert events at venues found throughout the State.  New York's entertainment industry contributes to our State's economy and the quality of life for all New Yorkers.

- 8 -

The purchase of tickets to places of entertainment has generally been divided into the primary market - the initial sale of tickets from the box office or agent for the venue - and the secondary market - the resale of tickets by individuals possessing tickets they can no longer use, season ticket holders looking to defray the cost of season ticket ownership, or unlicensed speculators and licensed brokers who obtain tickets in varied ways seeking to sell them for a profit. For many years, New York limited the price at which tickets to places of entertainment could be resold.  From 1922 until 2007, New York statutes imposed such restrictions, commonly referred to as 'price caps'.[4]  Regulation of the resale industry was first codified in Article 10-B of the General Business Law.[5] This statute, and its progeny, limited the price at which tickets to places of entertainment could be resold.  Until the price cap was repealed in 2007, the price limit at which tickets to places of entertainment could be resold was steadily increased from 50 cents, to 20-45% over the established price. In 2007, the price cap provisions of Article 25 of the Arts & Cultural Affairs Law were repealed for a trial period during which the effect of the statutory amendment was to be studied.[6]   The 2007 law contained a 'sunset provision' whereby the amendments would be repealed on June 1, 2009, absent further legislative action.  In June of 2009, a bill was passed to extend the 2007 amendments and continue the repeal of price caps. The current iteration of the law remains in effect until May 15, 2010.

Under current law, the Department of State registers ticket resellers, administers the statewide regulatory program and shares enforcement authority with the Office of the Attorney General and local law enforcement.  As part of its regulatory duties, the Department reviews applications from ticket resellers for competency and trustworthiness, collects proof that licensed resellers maintain the bond required by statute, investigates allegations of misconduct and, if sufficient proof of such misconduct exists, the Department may commence disciplinary proceedings to revoke the license or otherwise impose appropriate sanctions.  Since the inception of the Department of State's ticket reseller program in 2007, there have been a total of 201 licenses issued, with 56 current licensed resellers.   The Department has received fourteen complaints against licensed ticket sellers.

---

[4] L. 1922, c. 590
[5] Id.
[6] L. 2007, c. 61

## The Use of The Internet to Sell Tickets

In the last decade, the internet has dramatically impacted the ticket industry, both the primary market and the secondary market.  There are many websites that sell tickets and it is often difficult to determine whether the site is offering tickets from a primary market agent, a licensed ticket reseller, or from an unlicensed reseller.  Resellers use the internet both to purchase and resell tickets.  Most resellers do not maintain their own websites for the purpose of reselling tickets to consumers.  Rather, resale primarily occurs on resale websites, such as Stubhub.com, which act as platforms for ticket resellers to advertise and sell available tickets. These sites do not have an ownership interest in the tickets being sold and act merely as a virtual marketplace. This appears to be in contrast to the industry as described in 1999 when an investigation by the Office of the Attorney General found that kickbacks, fraud and secretive dealings were the norm in the resale industry.[7]  Since that time, the trend nationwide has been toward internet sales and deregulation; many states, including New York, have amended their laws to remove price-caps in order to "permit a free market to work its magic."[8]  While illicit schemes to obtain premium tickets still exist, the ticket resellers who met with the Department described a myriad of legitimate ways in which they obtain tickets for resale.  Some ticket resellers are members of fan-clubs and other pre-sale promotion groups which are offered tickets before they are released to the general public.  Resellers may also purchase season tickets and box seats that guarantee them a source of tickets to resell to the public.  Resellers also employ large numbers of employees who purchase tickets by use of telephones and computers.  Others use computer systems and programs that invade primary market websites and unfairly obtain tickets to the detriment of the general public.

Some resale websites provide a level of protection to consumers. For example, Stubhub.com claims that it utilizes antifraud tools to ban abusive resellers from its site and provides a "Fan Protect Guarantee," whereby Stubhub tracks the package, confirms delivery and

---

[7] Office of the Attorney General, Bureau of Investor Protection and Securities, Why Can't I Get Tickets? Report on Ticket Distribution Practices, May 17, 1999.

[8] Nicholas Confessore and Danny Hakim, Albany Close to Agreement to Ease Ticket Resale Limits, NYTimes, May

follows up with the seller if there is a problem.  Ticketnetwork.com also reported that it utilizes internal policies to restrict fraud and other abuse by ticket resellers, and that it imposes sanctions for violations of this policy, including fines and banning abusive resellers.   Similarly, Ticketmaster reported that it employs protections for consumers on its resale website, Ticketsnow.com, including banning certain resellers from advertising tickets for sale.

## The Current Law

Article 25 of the Arts & Cultural Affairs Law contains the provisions regulating the resale of tickets in New York.  Section 25.01 declares that oversight of the transactions for the purchase of tickets to places of entertainment is a public interest and that enforcement of the article's provision extends to all businesses that sell tickets to entertainment that occurs within New York's boundaries.  Section 25.07 requires that ticket resellers refund the purchase price under certain conditions, such as the cancellation of the event.  Section 25.09 provides that "[a]ny person who in violation of section 25.13 (licensure provision) of this article unlawfully resells or offers to resell or solicits the purchase of any ticket to any place of entertainment shall be guilty of ticket speculation."  Section 25.13 provides for the licensing of ticket resellers by the Department of State.  Website platforms that facilitate ticket resale, but do no engage in the resale itself, are exempted from licensure requirements under section 25.13.[9]

Section 25.17 of the Arts & Cultural Affairs Law permits the Department to request information from licensed ticket resellers and places of entertainment about said licensee or promoter's business, business practices and business methods, when the request is related to a complaint.  The statute does not grant the Department subpoena power or other general authority to compel the production of material and records to monitor the industry.  As such, in preparing this report, the Department was confined by the limited authority given by statute and relied on that material which the Department obtained through its independent research and that which was voluntarily produced by industry representatives.

---

31, 2007, quoting former Governor Eliot Spitzer.
[9] See, Communications Decency Act, 47 U.S.C. sec. 230.

The Department does not have enforcement jurisdiction over the primary market.  While the Department may request information from places of entertainment about the promoter's business, business practice and business methods, its request for such information must be based on and related to a complaint against a licensed ticket reseller.[10]   Article 25 of the Arts & Cultural Affairs Law places two primary prohibitions on the primary market.  Section 25.30 prohibits operators of places of entertainment who offer season ticket packages and other ticket subscriptions from restricting the resale of tickets.  The second limitation on the primary market is found in section 25.09 of the statute which defines 'ticket speculators' to include operator's agents who sell or convey tickets to a secondary ticket reseller owned or controlled by the operator's agent. Violations of section 25.09 are unclassified misdemeanors, prosecuted by the Office of the Attorney General or local law enforcement.[11]

The Department does not have jurisdiction over unlicensed activity, which, pursuant to section 25.35, is a misdemeanor and handled by local law enforcement or the Office of the Attorney General.  Section 25.35 also expressly permits consumers to bring private civil actions.

Under Chapter 68 of the Laws of 2009, the Department has been specifically asked to report on the following issues:

(1) The public policy benefit that is furthered by disclosing the number of tickets available for sale to the general public for a particular event;

(2) The harm to the public that results from the practice of ticket speculation, if any, by persons that have access to tickets before the time of initial sale to the general public or at any other time;

(3) A comparison of the availability and cost of tickets in the State with that of other states where price caps in the secondary market are in effect;

(4) The need for better enforcement of existing penalties or the need for greater penalties for violations of this section;

(5) The impact of the use of computer programs and auto-dialing phone systems on the general availability of tickets and the impact of such programs and systems on the ability to purchase blocks of tickets;

---

[10] Arts & Cultural Affairs Law section 25.17.
[11] Arts & Cultural Affairs Law section 25.35.

(6) The feasibility of effective enforcement of ticket selling and reselling by in-state and out of state ticket sellers and resellers;

(7) The public benefit and the public cost of an unregulated secondary market;

(8) The public benefit and usefulness of publishing the average price of tickets for an event after the event takes place; and

(9) The economic impact of the current law on the State.


## SECTION II

**I.   WHAT IS THE PUBLIC POLICY BENEFIT THAT IS FURTHERED BY DISCLOSING THE NUMBER OF TICKETS AVAILABLE FOR SALE AND THE NUMBER OF TICKETS WITHHELD FROM THE GENERAL PUBLIC FOR A PARTICULAR EVENT?**

There exists within the entertainment industry a customary practice of withholding a percentage of tickets from public sale. Commonly known as 'holds', these tickets are reserved for persons and groups such as event promoters, performers, entertainment critics, celebrities and local dignitaries.  The number of tickets withheld from general sale varies greatly.  It has been reported that at least one-fourth, and perhaps up to three quarters of all tickets are withheld from general sale.[12]  For example, it was been reported that for the December 3, 2007 Hannah Montana concert in Kansas City, Missouri, out of 11,000 available seats, only 4,000 were released to the general public.  In November 2009**,** a news report found that out of 13,000 seats to a Taylor Swift concert in Nashville, Tennessee, only 1,600 were set aside for sale to the general public.[13]  In another example, for the 2005 World Series, the White Sox baseball team publically stated that "several thousands" of tickets would be made available to the public, but never confirmed the exact number of tickets being released or that "the vast majority of seats were reserved for season ticket holders, Major League Baseball affiliates and others."  The limited tickets released for the four home games went on sale to the public at noon through Ticketmaster on October 18, 2005, and sold out within eighteen minutes.[14]

---

[12] Scott D. Simon, If You Can't Beat 'em, Join 'em: Implications for New York's Scalping Law in Light of Recent Developments in the Ticket Business, 72 Fordham L. Rev. 1171, 1176 (2004).

[13] Scalpers, Wealthy Get Great Seats for Taylor Swift, newschannel5.com.

[14] Jonathan Bell, Ticket Scalping: Same Old Problem With a Brand New Twist, 18 Loy. Consumer L. Rev, 435, 2006.

The percentage of hold seats varies per event, and is determined by the artist, venue and concert promoter, but often hold tickets account for some of the most desirable seats for an event.[15]

Currently, promoters and primary sellers are not regulated by the Department of State and information regarding the use of holds is difficult to obtain as the industry considers it proprietary information.   The Department lacks the authority to compel the production of information on holds.  Consumer advocates contend that they have observed an increase in the percentage of tickets that are being withheld.  While no documentation was submitted to support this contention, the use of concert holds appears to be a widespread and customary practice in the entertainment industry.

The average consumer is unaware that numerous tickets are withheld from public sale and that this practice diminishes the likelihood of obtaining a quality ticket at the initial box office price.   It has been argued that the failure to disclose the use of hold tickets leads to the misperception that ticket resellers are purchasing all of the tickets.   Certainly, customer frustration can be expected given the speed with which tickets to some popular events appear to sell out.  One rationale for requiring disclosure of hold tickets would be to provide additional information to the general public to prevent unrealistic expectations and enable consumers to make informed decisions about attending and obtaining tickets to popular events.  However, for consumers still interested in attending an event, disclosure may be of limited value – it is unclear whether it would improve access to tickets on the primary market or affect the sale or resale price of a ticket.  The degree to which disclosure is valuable as an investigatory or punitive measure for consumers is dependent upon consumer diligence in comparing tickets available on the secondary market against tickets that were initially offered for public sale.

Another argument in favor of disclosing the number of tickets for general sale is to decrease the likelihood of fraud and illicit dealings between those having access to tickets at the time of initial sale and those seeking to purchase tickets for resale.   In 1995, the New Jersey Attorney General found that many tickets were diverted from the general sale by the lawful use

---

[15] 1999 Attorney General Report, p. 21.

of 'holds' and by other illicit means.[16] The New York Attorney General reached a similar conclusion:

> The manipulation of the house seat system appears to be the primary way that desirable tickets reach the hands of [  ] brokers.  Some house seats are sold on a retail basis by persons (such as performers and creators) who are contractually entitled to seats for each performance of a Broadway play, and who provide them to a ticket broker for a premium as part of an ongoing arrangement....hundreds of tickets can be made available to [  ] ticket brokers from the multitude of tickets withheld from public sale for a long list of parties related to certain events....During the weeks after the opening of a hit show, persons entitled to the use of the seats and their friends and relatives may use the seats.  Into the run of the show, the demand by authorized house seat holders inevitably decreases.  Experienced box office employees have become familiar with this pattern and sell these seats directly to brokers either at the time...when they are supposed to go back into the system for sale to the general public or even before such time...[17]

Consumer advocates contend that unused hold tickets are supposed to be placed on sale to the general public and that the disclosure of hold ticket numbers would increase this likelihood.  Removing the secrecy surrounding the use of holds would help prevent these abuses.

Disclosure through regulatory enforcement, for review by authorized regulatory entities only,  might be more valuable to enforcement entities seeking to track the flow of tickets to the secondary market and uncover criminal violations.  This would more readily coincide with the legislative intent to safeguard the public against fraud and extortion in ticket transactions.

New York venues argue that any statutorily required disclosure of seat availability would place New York venues at a competitive disadvantage to venues in other states.  They contend that promoters have valid business reasons for not disclosing the number of hold seats and that if New York were to impose a disclosure requirement that is not required in other states, New York would be less desirable as a venue and artists and promoters would bypass New York in scheduling concerts and other events.  This could have an economic impact not only on New York entertainment venues, but on restaurants, hotels and other businesses that derive profits

---

[16] NJ Attorney General & Director of Consumer Affairs Report to Governor Christine Todd Whitman on Access to Entertainment in New Jersey.

[17] NYS Office of the Attorney General, Bureau of Investor Protection and Securities, Why Can't I Get Tickets? Report on Ticket Distribution Practices, May 17, 1999, at pg. 22.

from entertainment events in New York State.[18]   However, as promoters underscore the importance of New York as a kickoff location for many concert tours, it is difficult to value the merits of the claim that artists would seek to skip New York.

Finally, it is clear that a one-size-fits-all approach to disclosure will not work given the varying types of events held in New York.  For season-long sporting events, or event series that require subscriptions, useful and balanced disclosure provisions would be difficult to implement, monitor and enforce.  Further, it is apparent that most complaints and media attention related to the diversion of tickets to the secondary market are associated with single performance events such as concerts or professional sports playoff and championship games.

## II.   THE HARM TO THE PUBLIC THAT RESULTS FROM THE PRACTICE OF TICKET SPECULATION,  IF ANY,  BY PERSONS THAT HAVE ACCESS TO TICKETS BEFORE THE TIME OF INITIAL SALE TO THE GENERAL PUBLIC FOR A PARTICULAR EVENT OR AT ANY OTHER TIME

The diversion of tickets from general sale by persons that have access to tickets before the time of initial public sale has been identified as a problem in the industry.  This practice , commonly referred to as "ticket speculation" [19]was highlighted in the 1999 Attorney General report where it was found that, rather than release tickets to the public for general sale, some dishonest employees of the primary seller would instead sell tickets to resellers for a kickback – a practice termed "ICE."  The report also focused on the misuse of Ticketmaster computer terminals by unscrupulous terminal operators who received kickbacks for allowing the purchase of tickets before the public had access. [20]  In meeting with the Department, Ticketmaster

---

[18]  It should be noted that Federal legislation has been introduced by Congressman Bill Pascrell to require this disclosure in all states. (June 1, 2009 Press Release, www.pascrell.house.gov).

[19] . Under New York law, a 'ticket speculator' is narrowly defined as one who violates section 25.13 by reselling or offering to resell a ticket without a license.  See Arts & Cultural Affairs Law, section 25.09.  Further, section 25.13 prohibits an operator's agent from selling tickets to a secondary ticket reseller *owned or controlled by the operator's agent*.

[20] 1999 Attorney General Report, p. 16.

explained that this problem had diminished through better oversight and the increase of online sales.

Commentators have opined that ticket speculation is not limited to box office employees and that promoters themselves may intentionally under-price tickets so as to, "... enable promoter insider-trading, the practice of intentionally withholding the best tickets from public sale so that the promoters themselves can sell tickets to scalpers at prices above face value or give them away to favored parties."[21]

Recent events surrounding the sale of tickets to Bruce Springsteen concerts in New Jersey shed light on the harm to the public resulting from ticket speculation by those with access to tickets before general sale to the public.  In that state, it is alleged that investigators were able to buy tickets days before they went on sale.  Some of the tickets, it has been alleged, were priced significantly above face value and others were allegedly for seat locations that did not exist in the arena.[22]  When the tickets went on sale, the concerts quickly sold out and many seeking to purchase tickets through Ticketmaster were redirected to a subsidiary website where tickets were being resold for many times the face value of the ticket.[23]  The New Jersey Attorney General recently filed suit against companies that offered tickets to Bruce Springsteen concerts before they were available to the public and the state is considering legislation to prevent the sale of tickets before they go on sale to the public.[24]

Industry representatives report that they have taken steps to combat ticket speculation by the use of internal controls, audits and other measures.  However, representatives opine that ticket speculation will always exist.

Whether ticket speculation is defined as unlicensed activity or the conveyance of tickets to a reseller by one entrusted to sell or release tickets to the general public, the end result for the consumer is the same.  Speculation and criminal diversion diminishes the ability of consumers to

---

[21] Scott D. Simon, If You Can't Beat 'Em, Join' Em: Implications For New York's Scalping Law In Light of Recent Developments in the Ticket Business, 72 Fordham L. Rev.  1171,  2004.

[22] Porter, David, NJ Congressman's Bill Targets Online Ticket Selling, philly.com, June 2, 2009.

[23] Owen Moritz, Bruce Springsteen Rocks Ticketmaster Boat, NY Daily News, February 24, 2009. (nydailynews.com/entertainment/music/2009/02/23/2009-02-23_bruce_springsteen); See also, Mike Rispoli, Getting Into a NJ Bruce Springsteen Concert Is Harder Than Imagined, May 20, 2009, nj.com/news/).

[24] Id.

obtain tickets at list price, results in the inflation of ticket prices and, as in the above reported instance where Bruce Springsteen concert tickets were being resold before they went on sale to the general public, could result in the selling of tickets for nonexistent seats.

In order to meet the public's interest by protecting them from "fraud, extortion and similar abuses," including the criminal diversion of tickets to the secondary market, the statute prohibiting ticket speculation should be vigorously enforced.


## III.   A COMPARISON OF THE AVAILABILITY AND COST OF TICKETS IN NEW YORK STATE WITH THAT OF OTHER STATES WHERE PRICE CAPS IN THE SECONDARY MARKET ARE IN EFFECT

The Department has studied ticket pricing, availability and other issues surrounding the sale of tickets to different types of entertainment events in New York and in states that limit the resale price of tickets. [25]   Ticket sales on both the primary and secondary market were researched for the following events:


(1)   Taylor Swift

New Jersey[26] concert dates: May 12, 2010, May 13, 2010

New York concert dates: May 14, 2010, May 15, 2010

(2)   Miley Cyrus

New Jersey concert dates: November 7, 2009, November 8, 2009

New York concert dates: November 18, 2009, November 19, 2009

Georgia[27] concert dates: November 29, 2009

(3)   Trans-Siberian Orchestra

New York concert date: December 11, 2009

---

[25] The details of the Department's research are set forth in Appendix B to this report.

[26] Pursuant to New Jersey statute, registered ticket brokers are prohibited from reselling tickets in excess of 50% of the price paid to acquire the ticket, plus lawful taxes.  Unregistered ticket brokers are prohibited from reselling for an amount in excess of 20% of the ticket price, or $3.00, whichever is greater, plus lawful taxes. (NJSA 56:8-33).  The resale price caps do not apply to internet web site transactions. (Id)

Rhode Island[28] concert date: November 18, 2009

Massachusetts[29] concert date: November 19, 2009

New Jersey concert date: December 12, 2009

(4)     Playhouse Disney

New York show:  April 3, 2010

New Jersey show:  November 27, 2009

(5)     Mamma Mia!

New York production: December 26, 2009

Massachusetts production: December 26, 2009

(6)     Lady Gaga

New York concert: January 20, 2010

New Jersey concert: December 3, 2009

## A.     TICKET AVAILABILITY THROUGH THE PRIMARY MARKET

It has been argued by those in favor of deregulation of the secondary market that the removal of price caps increases the availability to tickets on the primary market.  While these arguments were reiterated to the Department during the preparation of this report, no documentary evidence was produced to substantiate these claims.   The Department's independent research failed to substantiate any connection between the existence of a price cap and the availability of tickets on the primary market.

1.     There is no conclusive evidence that the existence of a price cap affects ticket availability on the primary market.

---

[27] In Georgia, unregistered ticket brokers are prohibited, by statute, from reselling tickets for a price in excess of the face value of the ticket. (Ga. Code Ann. Section 43-4B-25) Registered brokers may charge a service fee of up to $3.00 unless the sponsor of the event authorizes a higher charge. (Id)

[28] In Rhode Island, ticket resale is generally prohibited at a price greater than the list price, including taxes, and a reasonable service charge not to exceed three dollars ($3.00) or ten percent (10%) of the price printed on the ticket, whichever is greater. (Gen Laws § 5-22-26)

[29] Massachusetts state law prohibits licensed ticket brokers from reselling tickets in excess of the face value of the ticket plus $2.00 in service fees. (MGLA 140 section 185D).

The Department researched ticket availability on the primary market in New York and in nearby states that limit the resale price of tickets. The Department then analyzed the results of this research in order to determine if the existence of a price cap affects the availability of tickets on the primary market. After examining ticket availability for nineteen different events, the Department was unable to make any such connection between the existence of a price-cap and ticket availability.

For some events researched, New York had less ticket availability than states with price caps. For example, for Taylor Swift tickets, limited tickets were available to Swift's New York concerts, but numerous tickets through the primary seller were available in New Jersey. The Department was also able to locate more tickets to pop music artist Lady Gaga's December 3, 2009 concert in New Jersey than to her January 10, 2010 concert in New York City.

For other events, ticket availability on the primary market was greater in New York than in states with price caps. Two such events were showings of Broadway theater production, 'Mamma Mia!' in New York City and Boston and Miley Cyrus' concerts in New York, Georgia and New Jersey. Ticket availability in New York was comparable to that in other states such as Rhode Island, Massachusetts and New Jersey for productions of the Trans-Siberian Orchestra.

The conflicting and divergent results of the Department's research fail to substantiate that there is a causal connection between the existence of a price-cap and ticket availability on the primary market. Availability differed per event, and did not appear to be influenced by whether the state where the event was being held imposed a cap of the resale price of tickets.

2.     The removal of New York State's price cap has not prevented tickets to popular events from selling out quickly and has not prevented tickets from reaching the secondary market before tickets are released to the general public.

Much media attention has been paid to difficulties obtaining tickets to popular events on the primary market. At 9:00 a.m. on February 2, 2009, tickets went on sale on Ticketmaster to two Bruce Springsteen concerts in New Jersey. Ninety-nine percent of tickets to the Saturday

concert were sold out by 9:45 a.m. and tickets to the other concert, on a Thursday, were sold out by 11:00 a.m.[30]

During the preparation of this report, pop music artist, Lady Gaga, was on tour.  Tickets to a January 20, 2010 concert at Radio City Music Hall, in New York City went on sale at noon on November 13, 2009.  The Department accessed the primary seller's website at noon on that day in an attempt to locate tickets.  Although tickets had just gone on sale, the best available seat was located in the upper most section of Radio City Music Hall (third mezzanine, row F).  At 12:04 p.m., no seats were available in the orchestra, by 12:05 p.m. no tickets were available to center stage seats and by 12:06 p.m. tickets were completely sold out to the event.

Although tickets to the New York City concert were sold out in the first six minutes, the day that tickets went on sale, one representative resale website had hundreds of tickets available for all sections of the Radio City Music Hall including three in the front row of the stage pit, four in the second row and two in the third row.[31]  Another online reseller later advertised a total of 603 tickets to this sold out concert.[32]

On November 12, 2009, the day before tickets went on sale in New York, one online reseller was selling numerous tickets to the event.[33]  As explained in section II of this report, one of the abuses highlighted in the 1999 Attorney General Report was ticket speculation by those with access to tickets before or at the time of general release.  The aforementioned ticket reseller advertised specific seats in Radio City Music Hall. It is difficult to believe that it would be selling these tickets without either already possessing them or having received a guarantee from the primary seller that these particular seats would be sold to the reseller.

The Department made a similar observation when researching tickets to 'Playhouse Disney Live!' which included a show in Albany, New York on April 3, 2010.  Although tickets

---

[30] Mike Rispoli, Getting Into A NJ Bruce Springsteen Concert is Harder Than Imagined, nj.com, May 20, 2009. Similarly, on September 8, 2009, tickets to a New York benefit concert by rapper Jay-Z sold out in minutes. Jay-Z Takes on Ticket Scalpers Trying To Make a Buck Off 9/11 Benefit Concert, October 23, 2009, huffingtonpost.com/2009/09.09.
[31] www.coasttocoasttickets.com
[32] www.tickets.gruvr.com.
[33] www.ticketliquidator.com.

did not go on sale to the general public until January 31, 2010, on November 12, 2009, ticket resellers were already advertising tickets to this show.[34]

One ticket reseller who met with the Department for the purposes of preparing this report argued that advance ticket availability on the secondary market is typically the result of season and box ticket holders selling their tickets to resellers.  It is also possible that persons having access to tickets during a pre-sale period sold their tickets to a reseller or that a reseller was able to purchase tickets during a pre-sale period directly from the primary market.  All of the resellers who met with the Department denied engaging in ticket speculation or other illicit dealings.  If this practice is still occurring, however, it could also account for the availability of tickets on the secondary market before the tickets go on sale to members of the general public.  What is clear is that the removal of New York's price cap has not prevented tickets from reaching the secondary market prior to general release to the public and has not prevented tickets to popular events from selling out quickly.

**B.      TICKET AVAILABILITY ON THE SECONDARY MARKET**

1.      There is no conclusive evidence that the existence of a price cap affects ticket availability on the secondary market.

The Department also examined ticket sales on the secondary market.  In doing so, the Department researched numerous events in New York and in states with resale caps.  The results of this research fail to provide conclusive evidence that the existence of a price cap affects ticket availability on the secondary market.   As with ticket availability on the primary market, the Department's research concluded that availability differs per event and does not appear to be influenced by the existence or nonexistence of a statutory price cap.  For some events, such as Mamma Mia!, ticket availability on the secondary market in New York was less than in Massachusetts, a nearby state which limits the price at which tickets may be resold.  For other

---

[34] www.ticketliquidator.com; www.coasttocoasttickets.com

events, such as Lady Gaga's concerts in New York and New Jersey, there was greater availability through the secondary market in New York.

In other instances, ticket availability was comparable in New York and in states with price caps. The Department researched ticket availability to Taylor Swift's concerts in New York and New Jersey. The results were similar: while the most desirable seats were unavailable through the primary seller, hundreds of quality floor and other tickets were available through online ticket resellers. A willing consumer would have been able to locate a ticket to any of the concert dates in any area of either venue. Ticket availability on the secondary market was also comparable for Trans-Siberian Orchestra concerts in New York, Rhode Island, Massachusetts and New Jersey.

To highlight the divergent results of the Department's research, attention is drawn to the Department's research into ticket availability to Miley Cyrus' concerts in New York, New Jersey and Georgia. The Department researched availability five days before each event. Comparing the results in all three states, New Jersey had the most tickets available on the secondary market (90) and Georgia had the least (40). New York fell in between these two states with a total of 68 tickets being available five days before the first of Cyrus' New York concerts.

2.    Ticketmaster's paperless ticket procedure is a new issue not currently addressed by statute.

One of the more controversial issues encountered by the Department during the preparation of this report is the implementation of Ticketmaster's 'paperless ticket' procedure. This procedure was created in the aftermath of the highly popular Hannah Montana tour, where tickets quickly sold out at the box office yet were available at significantly higher prices on the secondary market.

Customers purchasing paperless tickets through the primary market do not receive hard copy tickets in advance of the event and, rather, gain entry by presenting the credit card used to purchase the tickets. This arguably cuts down on ticket speculation insofar as the actual purchaser has to be present in order to gain access to the concert venue.    According to

Ticketmaster, the decision on whether or not to use this procedure is left up to the artist and promoter.

The recent Miley Cyrus concert was 100% paperless. Ticketmaster reported to the Department that use of the procedure noticeably increased ticket availability on the primary market. This contention has been repeated in media coverage of the new paperless procedure: "Those associated with the tour say public feedback has been generally favorable and that tickets are selling well, with nearly 500,000 purchased already. The fact that they're not blowing out immediately as they did on the last tour is evidence that brokers aren't flooding the system, they say."[35]

In researching ticket availability to Cyrus' concerts, the Department observed that while the implementation of paperless tickets may have created a hurdle for resellers, it has not prevented tickets from reaching the secondary market. For each concert researched, numerous tickets were available on the secondary market. Ticket reseller sites routinely instructed purchasers to meet with a company representative prior to the event in order to gain access to the concert.

Resellers and their advocates have argued that the paperless system is problematic, in part, due to refund and anti-competitive issues. If the original purchaser cannot attend the event, he or she lacks the ability to transfer the ticket unless willing to provide the credit card used to purchase the ticket to a third party. It was also argued that by using the system, the primary market could permit resale only through certain websites where the primary market could impose allegedly anti-consumer conditions, such as price floors.

This is an issue that will likely receive much scrutiny in the future, particularly if the frequency of the new procedure's use is expanded. While this was an issue raised by almost all of the advocates who appeared before the Department, it is not an issue that is addressed by the current law. Article 25 of the Arts & Cultural Affairs Law does not regulate the primary market, with the exception of section 25.30, which prohibits operators of places of entertainment who offer season ticket packages and other ticket subscriptions from restricting the resale of tickets.

---

[35] Ray Waddell, Miley Cyrus Fights Scalpers with Paperless Tickets, Reuters News, 6/21/09.

The paperless ticket procedure, to the extent that conditions are placed on the ability to resell the tickets, is arguably comparable, but is not specifically addressed in the current law.

## C.      TICKET PRICE ON THE PRIMARY MARKET

The Department's research failed to establish a link between the existence of a price cap and the price at which tickets are sold on the primary market.  In some instances, tickets were priced higher in New York and in others, less.  For Taylor Swift's New York concerts, the price of tickets on the primary market was less than in New Jersey, where a law is in effect limiting the price at which tickets may be resold.  Similarly, for Playhouse Disney Live!, the list price of tickets in New York was slightly higher than in New Jersey.  By comparison, tickets to the New York presentation of Mamma Mia! were priced higher in New York than in Massachusetts.  For other events researched, pricing was comparable in New York to that in states with price caps.

## D.      TICKET PRICES ON THE SECONDARY MARKET

It has been argued by supporters of deregulation of the secondary market that the removal of price caps reduces the price of tickets on the secondary market.  Advocates who met with the Department argued that they have seen a 15-20% drop in ticket prices in New York since New York's resale price caps were removed from statute.  No conclusive documentation was provided to support this contention.  Other advocates conceded that if ticket prices have dropped, the recent recession may be a contributing factor.

One document which was provided to the Department was a report by Forrester Research.[36]  This document contends that, of online secondary ticket buyers surveyed, 60% paid more than the face value, 23% paid the same price and 17% paid less than the face value.  What this report does not address, however, is the percentage of ticket buyers surveyed who reside in states with and without resale caps.  The Department researched ticket prices in New York and in

---

[36] Sucharita Mulpuru and Peter Hult, The Future of Online Secondary Ticketing: A Forecast of US Online Secondary Ticket Sales, 2007 to 2012, Forrester Research.

nearby states with resale price caps to determine if the existence of such a cap affects the price of tickets on the secondary market.

1.      There is no conclusive evidence that the existence of a price cap affects the price of tickets on the secondary market.

Ticket prices to the events researched by the Department varied greatly.   As with ticket pricing on the primary market, the Department was unable to establish any causal link between the existence of a price cap and the price of tickets sold by ticket resellers.  For some events, such as Playhouse Disney Live! and Lady Gaga, the price of resale tickets was higher in New York than in states with price caps.   For other events, such as Miley Cyrus, resale tickets were priced less in New York than in the other states researched.  In researching ticket prices to events in States with resale price-caps, the Department observed that state price caps are routinely exceeded online.

2.      Prices were generally more expensive on the secondary market.

In researching tickets on the secondary market, the Department observed that, in general, resale prices are higher than initial list price.  The only event researched where tickets were found on the secondary market for less than the list price was the November 18, 2009 Trans Siberian Orchestra concert in Rhode Island.  For all other events and dates researched, tickets on the secondary market were priced higher than initial list price.  This was true for events in New York and in states with price caps.   Some proponents of an unregulated secondary market have argued that ticket resellers typically reduce ticket prices prior to an event in order to recoup their investment.  While the Department did observe a reduction in ticket prices for some events, in other instances ticket prices actually increased as the event neared.  In all instances, the price of tickets offered by reseller websites continued to exceed the list price.

**IV.   IS THERE A NEED FOR BETTER ENFORCEMENT OF EXISTING PENALTIES OR THE NEED FOR GREATER PENALTIES FOR VIOLATIONS OF THE STATUTE?**

Article 25 of the Arts and Cultural Affairs Law contains several different enforcement provisions which vest different types of authority in the Department of State, law enforcement and consumers.  The Department's authority is limited to pursuing violations against licensed ticket resellers. For those licensees who commit certain violations of the statute and regulations, the Department is authorized to revoke or suspend a license, impose fines and order restitution.[37]

The Department does not have enforcement authority over unlicensed persons or entities. Under the statute, unlicensed activity is a misdemeanor.[38]   The Department also lacks jurisdiction over the primary market.  For violations relating to primary sale, private civil rights of action are specifically permitted by statute.[39]

Since 2008, the Department has received 14 complaints alleging violations against ticket resellers.  Of these 14 complaints:  five alleged that a ticket was sold for higher than the list price, which is not a statutory violation; eight alleged violations against entities over which the Department did not have jurisdiction, such as disputes with primary sellers and internet platforms.   Only one of the complaints alleged a violation of the statute over which the Department has jurisdiction; that a ticket reseller failed to deliver tickets.  This file was closed after the witness who brought the matter to the Department's attention abandoned the complaint.

Section 25.17 of the Arts & Cultural Affairs law authorizes the Department to conduct investigations and obtain information and documentation from licensees.  The statute, however, limits the scope of Departmental investigations to the content of the complaint which initiated the investigation. The Department licenses and regulates 28 other professions and occupations. The provision at issue is an anomaly and is not found in any of the other licensing statutes administered by the Department.   Other licensing statutes authorize the Department to investigate any violation of the statute or regulation and permit inspection and audit.[40]   Such authority is necessary and appropriate.

---

[37] Arts & Cultural Affairs Law section 25.31.
[38] Arts & Cultural Affairs Law section 25.35.
[39] Arts & Cultural Affairs Law section 25.33.
[40] See, for example, Real Property Law §442-e(5); Gen. Bus. Law §89-hhh; Gen. Bus. Law §387; Gen. Bus. Law §73(1); Gen. Bus. Law §73(2); Gen. Bus. Law §803.

The majority of resale business is through these online resale sites.  Consumer advocates contend that there is a considerable amount of unlicensed resale activity, primarily occurring online.  Resale websites do not customarily advertise the identity of the person selling the ticket.  As such, it is impossible to determine from simply viewing the website if the reseller is complying with relevant licensing laws.  Without express statutory authority to request information from online resale sites and compel their compliance, the Department will be unable to obtain relevant information and documentation.  The Department is not asking that these entities, which are currently exempt from registration, become registered, recognizing that there are potential jurisdictional limitations to enforcement as it relates to these entitles.   However, the absence of this information hampers thorough and efficient investigations of statutory violations insofar as the current dynamics of the resale marketplace make it difficult to readily identify statutory violations.

## V.    THE IMPACT OF THE USE OF COMPUTER PROGRAMS AND AUTO-DIALING PHONE SYSTEMS ON THE GENERAL AVAILABILITY OF TICKETS AND THE IMPACT OF SUCH PROGRAMS AND SYSTEMS ON THE ABILITY TO PURCHASE BLOCKS OF TICKETS

Computer programs and auto-dialing devices permit some ticket brokers to quickly purchase large blocks of tickets to particular events in the process bumping average consumers out of virtual waiting lines.  The result is that primary market tickets to events are quickly sold out.  These tickets, show up at elevated prices on the secondary market often within minutes.. "Software designers are creating programs that allow the brokers to cut in line and purchase large quantities of tickets while simultaneously blocking the average consumer from doing the same."[41]

---

[41] Clark, Kirkman, <u>Who Needs Tickets? Examining Problems in the Growing Online Ticket Resale Industry</u>), Federal Communications Law Journal, June 2009.

- 28 -

All of the advocates who met with the Department of State agreed that the use of such devices is a significant issue. It was reported that the use of these devices results in damage to computer systems and requires significant resources to repair system damage and to combat such "attacks". The resellers who met with the Department denied using these devices, yet did acknowledge that they are being used by some ticket resellers. All advocates who met with the Department stated that they favor a law outlawing the use of these computer devices.

The use of these systems has received much attention due in part, to the unfair advantage they provide ticket brokers in obtaining tickets at the time of initial sale.

> To date, the most pointed example of potential Internet misuse by ticket brokers occurred in 2007. The hugely popular 'teenie-bopper' and Disney star Miley Cyrus/Hannah Montana, launched her "Best of Both Worlds Tour"....Tickets to these performances "follow[ed] a distressingly consistent pattern: At 10 a.m. on a Saturday, tickets [went] on sale, and by 10:05 a.m., all tickets [were] sold. Yet by 10:05 StubHub and other ticket exchanges already ha[d] a plenitude of tickets listed for the sold out event. Tickets had face values of $21 to $66 but parents who had the opportunity to pay that face value price were few and far between. Instead, most were forced to go to Websites like StubHub and pay, on average, a price of $258 per ticket, not to mention a twenty-five percent markup comprising StubHub's take.[42]

In 2007, Ticketmaster won an $18.2 million judgment and permanent injunction against a company which allegedly developed and sold automated devices that enabled ticket brokers to override security measures on Ticketmaster's website. Ticketmaster alleged that these devices flooded Ticketmaster's computers with automatic requests for tickets, which prevented ordinary consumers from accessing the website and which enabled clients to purchase large quantities of tickets.[43] The ticket broker admitted to using automated devices to search and request tickets from Ticketmaster's website, "sometimes more than 100 seats at a time."[44] In granting a preliminary injunction against the company, the court found that, "it is evident that Defendant's

---

[42] Id.
[43] Ticketmaster, LLC v. RMG Technologies, Inc., 507 F. Supp2d 1096, 1116 (CD Cal. 2007); (see also, (Branch, Alfred Jr., Ticketmaster Wins $18.2 Million Judgment Against RMG Technologies, Ticketnews, Jun 25, 2008.
[44] (Rosen, Ellen, In the Race to Buy Concert Tickets, Fans Keep Losing, nytimes.com, www.nytimes.com/2007/10/06/business/06money.html

conduct not only harms Plaintiff, but also harms the public because it denies consumers the opportunity to purchase tickets to events at the face price. Thus, insofar as Defendant's misconduct allows its ticket broker clients to unfairly purchase numerous tickets for resale resulting in immediately sold out events, ordinary consumers must either forego the event or pay ticket brokers inflated prices for resold tickets."[45]

Several states have taken action to combat the problem of automated devices.  As of 2008, six states including Oregon, Florida, Illinois, Indiana, Pennsylvania and New Jersey had passed or considered legislation banning the use of software that enables ticket brokers to quickly purchase large blocks of tickets.[46]  In 2007, the Missouri Attorney General brought suit against three online brokers alleging, in part, that the ticket resellers used computer software to purchase all of the tickets to popular events and then sold the tickets to the general public at inflated prices.[47]

## VI.    THE FEASIBILITY OF EFFECTIVE ENFORCEMENT OF TICKET SELLING AND RE-SELLING BY IN STATE AND OUT-OF-STATE TICKET SELLERS AND RESELLERS

The Arts & Cultural Affairs Law requires the registration of any business reselling a ticket to an event occurring within New York State.  In amending the statute, the Legislature expressly declared that businesses domiciled outside New York are not exempt from the statute.[48]  Some commentators have argued that, due to the emergence of the Internet as the primary means of reselling tickets, enforcement of ticket reselling laws has become more difficult.

The use of "virtual marketplace" websites makes it difficult to identify the person or entity reselling the ticket.  If the Department were to receive a complaint about an Internet

---

[45] Id, at 1116.

[46] Petty, Daniel, Scalpers Beware: States Target Ticket Sellers, Stateline.org, June 5, 2008, www.stateline.org/live/details/story?contentID=315305. See also, Oregon Revised Statutes section 646.608, Florida Statutes section 817.38, Illinois House Bill 1044, Indiana Code section 35-43-2-3, New Jersey Assembly Bill 4138, and Pennsylvania Consolidated Statutes section 143, number 62.

[47] Lisa Wade McCormick, Missouri Scalping Crackdown Gets Results: Online Scalpers buy Out Entire Concerns in Some Cases, Consumeraffairs.com, 10/22/07, www.consumeraffairs.com/news04/2007010/mo_scalpers2.html.

[48] Arts & Cultural Affairs Law, section 25.01.

transaction, it needs the ability to identify the ticket reseller.   Some have argued that because the licensure and regulation of ticket resellers differs from state to state, and because most tickets are now sold online, enforcement may prove difficult. "In fairness to a lot of users, the law isn't always that clear....You're often dealing with an Internet company incorporated in one state, operating in a second state, with a server in a third state, the buyer in a fourth state and the event is in a fifth state.  Which law applies?"[49]

As currently enacted, the statute does not provide the Department with authority to obtain information and records from Internet websites; only licensees and operators of places of entertainment are obligated to provide the Department with information and documentation.[50]

One reseller who met with the Department stated that there is a large amount of unlicensed activity occurring online.   Without a statutory amendment to enable the Department to obtain information from these platforms about the identity of the resellers listing tickets on the site, enforcing the licensure and other provisions of the statute will be difficult.  Once the identity of the reseller is established, enforcing the statute is possible. The Department has clear statutory authority to commence enforcement proceedings against any licensee who has allegedly violated a provision of the statute or implementing regulations.  Likewise, with this information the Department would be enabled to provide meaningful information to the appropriate law enforcement agency for the prosecution of unlicensed resellers.

The statute requires licensees to file a bond with the Department to provide security for future awards.  Thought should be given to amending the statute to make it easier for the Department to levy the bond for unpaid fines and restitution without the need for court intervention as is consistent with other enforcement statutes.    Real Property Law section 446-b, another licensing statute which could be used as a model, requires apartment information vendors to file proof of maintaining a special interest bearing trust account.  Money may be withdrawn from this account upon certification of the Secretary.  Such an amendment would avoid the need for the Department to commence an action in State court to levy the bond.

---

[49] Zaret Elliot, Will the Net End Ticket Scalping, quoting Rob Chesnut, eBay associate general counsel, ZDNet News, September 3, 1999, http://news.zdnet.com.
[50] Arts & Cultural Affairs Law section 25.17.

## VII.   THE PUBLIC BENEFIT AND THE PUBLIC COST OF AN UNREGULATED SECONDARY MARKET

One of the benefits in removing the price caps has been the legitimization of the ticket resale industry.   In 2007, there were approximately 700 ticket broker websites operating in North America with annual revenues ranging from $2.5 billion to $10 billion.[51]  Data provided to the Department by one ticket reseller estimates that the secondary market sustains between 1,100 and 1,800 jobs in New York State, most of which are small businesses.

Most of the ticket resellers currently licensed by the Department of State have primary business addresses in New York State.  The legitimization of the ticket resale industry provides business and employment opportunities for New York residents.  While these jobs likely existed prior to the amendment of the statute, by legitimizing the industry, these businesses and individuals are now more likely to pay taxes and contribute to the State's economy.

The ticket resale market provides a mechanism for willing consumers to obtain high quality seats to popular events.  These consumers, who are willing to pay a higher fee, are able to still obtain tickets to an event without having to invest time and energy in attempting to obtain a quality ticket through the box office.   While prices in the resale market tend to be higher, particularly for popular and sold out events, consumers still retain some control over the price paid due to the large number of ticket broker websites.  Some have reported that prices may drop as the event nears.[52]   An unregulated secondary market also facilitates transactions between buyers and sellers.   Those who are unable to attend an event are able to locate a willing purchaser and sell the ticket to recoup his or her cost. Additionally, the secondary market provides a valuable service to tourists and visitors willing to pay a premium to purchase high-quality tickets to events on short notice.  In fact, the resale market provides significant benefits to the hotel industry, which uses concierge-procured tickets as a selling point.  In most cases, the

---

[51] NYC Council, Report of the Governmental Affairs Division on Introductory Bill No. 727-A, May 8, 2009; *quoting* Mansfied, B., "The Traps of Ticket Shopping: With So Many Purchasing Options, Fans Can See Like They're Being Played, USA Today, June 15, 2007, at 1 E.

[52] 18 Loy. Consumer L. Rev. 435, Simon, note 22, 1208); Brad Heath & David Shepardson, As Game Nears, Ticket

secondary marketplace also offers a safe alternative to unlicensed street-based scalpers, against whom consumers have no recourse when sold fraudulent tickets.  Any system that further restricts street scalping is typically viewed by local law enforcement as a positive benefit.

However, the secondary market also provides a forum to capitalize on gaps between the face value of a ticket and its actual market value.  The practice of assigning prices below market value creates a significant financial incentive for persons willing to speculate on tickets, as well as employees within the system looking to divert tickets to the secondary market for a fee.  The secondary market itself acts only as the forum within which speculators and brokers can resell tickets at their actual market value.  The high potential profit margins are the financial incentive that catalyzes competition for tickets on the primary market.  This same phenomenon is equally responsible for the criminal diversion of tickets to the secondary market.

For the consumer, this all makes obtaining a ticket at list price more difficult.  In general, particularly for popular and sold-out shows, purchasing a ticket from a ticket reseller results in the consumer paying more for the ticket.  But statutorily capping prices on the secondary market has been shown to have little effect in New York and other states.  Issues relating to interstate commerce complicate and, sometimes, frustrate enforcement efforts.  Further, were price controls to be effectively enforced in New York, the net effect would be that tickets would simply be resold to consumers outside of New York at a premium, further depriving New York consumers of access to ticket to events that wish to attend.

## VIII.   THE PUBLIC BENEFIT AND USEFULNESS OF PUBLISHING THE AVERAGE PRICE OF TICKETS FOR AN EVENT AFTER THE EVENT TAKES PLACE

Advocates have stated that publishing the average price of tickets for an event after the event takes place would benefit the public by providing information on which to base future purchasing decisions. They suggest that consumers would be able to use this information to determine if the price they paid was reasonable compared to the average price paid by others and enable them to make an educated determination about attending future events by that or similar

---

Costs Drop, The Det. News, 2/6/06, www.detnews.com.

artists or groups.  However, since many of the events discussed herein are single performance events, the practical value of this comparison is diminished.  Artists and promoters would probably agree that the average price paid for a ticket to a Bruce Springsteen show would provide no credible indication of an expected average price for a Miley Cyrus performance.

This information might be helpful from a legislative perspective insofar as it would enable lawmakers to assess trends over time, but because so many variables affect the demand for a particular show, the value of this information to consumers or policymakers is likely limited.

To be most useful, a publication requirement would encompass data from both the primary and secondary markets.  The implementation of such a requirement would be difficult. It is unlikely that secondary resellers and the primary market would be willing to provide price data to each other.  Compelling publication would create challenges from a resource perspective and would require jurisdiction over primary and secondary sellers to enforce the production of the needed data. Even then, the reliability of the data would be questionable given the variety of companies and persons reselling tickets, including those who are licensed, those who are exempt and those who do business without a license in violation of the statute.

## IX.    THE ECONOMIC IMPACT OF THE CURRENT LAW ON THE STATE

In 2005, the Arts & Cultural Affairs Law was amended to require ticket resellers to be licensed by the Department of State.  The statutory license fee is $5,000 per office and must be paid annually.   Currently, the Department of State licenses 55 ticket resellers, deriving approximately $275,000 in license fees per year.  Resellers have argued that the yearly fee should be decreased and that it would encourage more resellers to seek licensure.

All but four current license holders have principal offices located in New York State.  As such, these licensees pay rent and other related office expenses, may employ one or more employees and are required to pay New York State taxes.  One ticket reseller which met with the Department of State for the purposes of discussing the instant report maintains an office in New York State and employs over 60 individuals.  Another reported that it maintains two New York

- 34 -

State offices with approximately 30 employees.   While an exact dollar amount cannot be attached to these contributions, by choosing to be licensed and conduct business in New York State, these licensees are making a positive contribution to our State economy.

The economic impact of the current law on consumers is also impossible to calculate.  The Department's investigation revealed that, in general, ticket resellers charge more per ticket than it costs to obtain tickets from the primary seller.   As in any business, ticket resellers are in business to make a profit.   Were they merely able to recoup expenses, or forced to charge less than face value, ticket resellers would not be in the business of reselling tickets to places of entertainment.   The Department of State found that tickets were being resold in excess of face value regardless of the existence or nonexistence of price caps.    Based on the Department's research, it is not believed that the existence of a price cap reduces the price charged for tickets.   These prices seem largely driven by market forces. Ticket resellers will sell for the maximum profit and consumers will pay what they feel the ticket is worth.

## APPENDIX A

**This appendix includes Arts and Cultural Affairs Law Article 25, which is currently in effect until May 16, 2010.**

**ARTS AND CULTURAL AFFAIRS LAW, ARTICLE 25**
**TICKETS TO PLACES OF ENTERTAINMENT**
*Section*
25.01. Legislative findings
25.03. Definitions
25.07. Ticket prices
25.08. Additional printing on tickets
25.09. Ticket speculators
25.11. Resales of tickets within buffer zone
25.13. Licensing of ticket resellers
25.15. Bond
25.17. Supervision and regulation
25.19. Posting of license or certificate
25.21. Change of office location
25.23. Posting of price lists; information to purchaser
25.25. Records of purchases and sales
25.27. Commissions to employees of places of entertainment
25.29. Unlawful charges in connection with tickets
25.30. Operator prohibitions
25.31. Suspension or revocation of licenses
25.33. Private right of action
25.35. Criminal penalties

**§25.01. Legislative findings**.
The legislature finds and declares that transactions involving tickets for admission to places of entertainment are a matter of public interest and subject to the supervision of New York and the appropriate political subdivisions of the state for the purpose of safeguarding the public against fraud, extortion, and similar abuses.
The legislature further finds that many ticket resellers advertise and sell tickets to places of entertainment within the boundaries of New York state often from locations outside the state, without adhering to the provisions of this article. The legislature objects to any claim that businesses domiciled outside New York state are exempted from this statute when selling tickets to events occurring in New York state, regardless of the territories of origin of both the buyer and seller. It is the legislature's intent that all governmental bodies charged with enforcement of this article, including the attorney general of New York state have the authority to regulate the activities of all persons reselling tickets to venues located within this state to the full extent of the

state's powers under the federal and state constitutions and that this article be construed in light of this purpose.

## § 25.03. Definitions.

As used in this article the term:

1. "Entertainment" means all forms of entertainment including, but not limited to, theatrical or operatic performances, concerts, motion pictures, all forms of entertainment at fair grounds, amusement parks and all types of athletic competitions including football, basketball, baseball, boxing, tennis, hockey, and any other sport, and all other forms of diversion, recreation or show.

2. "Established price" means the price fixed at the time of sale by the operator of any place of entertainment for admission thereto, which must be printed or endorsed on each ticket of admission.

3. "Final auction price" shall mean the price paid for a single ticket by a winning bidder. In the case of a single action price for a ticket package, including packages containing tickets to multiple events, the final auction price per ticket shall be established by evenly dividing a prorated share of the winning bid, which shall be determined by the seller, by the number of tickets to such event.

4. "Not-for-profit organization" means a domestic corporation incorporated pursuant to or otherwise subject to the not-for-profit corporation law, a charitable organization registered with the department of law, a religious corporation as defined in section sixty-six of the general construction law, a trustee as defined in section 8-1.4 of the estates, powers and trusts law, an institution or corporation formed pursuant to the education law, a special act corporation created pursuant to chapter four hundred sixty-eight of the laws of eighteen hundred ninety-nine, as amended, a special act corporation formed pursuant to chapter two hundred fifty-six of the laws of nineteen hundred seventeen, as amended, a corporation authorized pursuant to an act of congress approved January fifth, nineteen hundred five, (33 stat. 599), as amended, a corporation established by merger of charitable organizations pursuant to an order of the supreme court, New York county dated July twenty- first, nineteen hundred eighty-six and filed in the department of state on July twenty- ninth, nineteen hundred eighty-six, or a corporation having tax exempt status under section 501(c)(3) of the United States Internal Revenue Code, and shall further be deemed to mean and include any federation of charitable organizations.

5. "Operator" means any person who owns, operates, or controls a place of entertainment or who promotes or produces an entertainment.

6. "Place of entertainment" means any privately or publicly owned and operated entertainment facility such as a theatre, stadium, arena, racetrack, museum, amusement park, or other place where performances, concerts, exhibits, athletic games or contests are held for which an entry fee is charged.

7. "Physical structure" means the place of entertainment, or in the case where a structure either partially or wholly surrounds the place of entertainment, such surrounding structure.

8. "Resale" means any sale of a ticket for entrance to a place of entertainment located within the boundaries of the state of New York other than a sale by the operator or the operator's agent who is expressly authorized to make first sales of such tickets. Resale shall include sales by any means, including in person, or by means of telephone, mail, delivery service, facsimile, internet, email or other electronic means, where the venue for which the ticket grants admission is located

in New York state. Except as provided in sections 25.11 and 25.27 of this article, the term "resale" shall not apply to any person, firm or corporation which purchases any tickets solely for their own use or the use of their invitees, employees and agents or which purchases tickets on behalf of others and resells such tickets to such invitees, employees and agents or others at or less than the established price. Similarly, the term "resale" shall not apply to any not-for-profit organization, or person acting on behalf of such not-for-profit organization, as long as any profit realized from ticket reselling is wholly dedicated to the purposes of such not-for- profit organization.

9. "Ticket" means any evidence of the right of entry to any place of entertainment.

**§ 25.07. Ticket prices.**

1. Every operator of a place of entertainment shall, if a price be charged for admission thereto, print or endorse on the face of each such ticket the established price, or the final auction price if such ticket was sold or resold by auction through the operator or its agent.

2. Notwithstanding any other provision of law, any person, firm or corporation, regardless of whether or not licensed under this article, that resells tickets or facilitates the resale or resale auction of tickets between independent parties by any means, must guarantee to each purchaser of such resold tickets that the person, firm or corporation will provide a full refund of the amount paid by the purchaser (including, but not limited to, all fees, regardless of how characterized) if any of the following occurs: (a) the event for which such ticket has been resold is cancelled, provided that if the event is cancelled then actual handling and delivery fees need not be refunded as long as such previously disclosed guarantee specifies that such fees will not be refunded; (b) the ticket received by the purchaser does not grant the purchaser admission to the event described on the ticket, for reasons that may include, without limitation, that the ticket is counterfeit or that the ticket has been cancelled by the issuer due to non-payment, or that the event described on the ticket was cancelled for any reason prior to purchase of the resold ticket, unless the ticket is cancelled due to an act or omission by such purchaser; or (c) the ticket fails to conform to its description as advertised unless the buyer has pre-approved a substitution of tickets.

3. Prior to the payment of a refund it shall be the obligation of the seller and purchaser to first make a good faith effort to remedy any disputes where the seller and purchaser have agreed to terms established by the licensee or website manager for the disposition of disputes as a condition to facilitate the transaction.

**§ 25.08. Additional printing on tickets.**

Every operator of a place of entertainment having a permanent seating capacity in excess of five thousand persons shall, if a price be charged for admission thereto, print or endorse in a clear and legible manner on each ticket, "This ticket may not be resold within one thousand five hundred feet from the physical structure of this place of entertainment under penalty of law".

**§ 25.09. Ticket speculators.**

1. Any person who in violation of section 25.13 of this article unlawfully resells or offers to resell or solicits the purchase of any ticket to any place of entertainment shall be guilty of ticket speculation.

2. Any person, firm or corporation which in violation of section 25.13 of this article unlawfully

resells, offers to resell, or purchases with the intent to resell five or more tickets to any place of entertainment shall be guilty of aggravated ticket speculation.

**§ 25.11. Resales of tickets within buffer zone.**

1. No person, firm, corporation or not-for-profit organization, whether or not domiciled, licensed or registered within the state, shall resell, offer to resell or solicit the resale of any ticket to any place of entertainment having a permanent seating capacity in excess of five thousand persons within one thousand five hundred feet from the physical structure of such place of entertainment.

2. No person, firm, corporation or not-for-profit organization, whether or not domiciled, licensed or registered within the state, shall resell, offer to resell or solicit the resale of any ticket to any place of entertainment having a permanent seating capacity of five thousand or fewer persons within five hundred feet from the physical structure of such place of entertainment, provided however that current licensees and those seeking a license under this article are exempt from such buffer zone when operating out of a permanent physical structure.

3. Notwithstanding subdivisions one and two of this section, an operator may designate an area within the property line of such place of entertainment for the lawful resale of tickets only to events at such place of entertainment by any person, firm, corporation or not-for-profit organization, whether or not domiciled, licensed or registered within the state.

**§ 25.13. Licensing of ticket resellers.**

1. No person, firm or corporation shall resell or engage in the business of reselling any tickets to a place of entertainment or operate an internet website or any other electronic service that provides a mechanism for two or more parties to participate in a resale transaction or that facilitates resale transactions by the means of an auction, or own, conduct or maintain any office, branch office, bureau, agency or sub-agency for such business without having first procured a license or certificate for each location at which business will be conducted from the secretary of state. Any operator or manager of a website that serves as a platform to facilitate resale, or resale by way of a competitive bidding process, solely between third parties and does not in any other manner engage in resales of tickets to places of entertainment shall be exempt from the licensing requirements of this section. The department of state shall issue and deliver to such applicant a certificate or license to conduct such business and to own, conduct or maintain a bureau, agency, sub-agency, office or branch office for the conduct of such business on the premises stated in such application upon the payment by or on behalf of the applicant of a fee of five thousand dollars and shall be renewed upon the payment of a like fee annually. Such license or certificate shall not be transferred or assigned, except by permission of the secretary of state. Such license or certificate shall run to the first day of January next ensuing the date thereof, unless sooner revoked by the secretary of state. Such license or certificate shall be granted upon a written application setting forth such information as the secretary of state may require in order to enable him or her to carry into effect the provisions of this article and shall be accompanied by proof satisfactory to the secretary of state of the moral character of the applicant.

2. No operator's agent shall sell or convey tickets to any secondary ticket reseller owned or controlled by the operator's agent.

3. The operator or the promoter shall determine whether a seat for which a ticket is for sale has an obstructed view, and shall disclose such obstruction. Every sale or resale of such ticket shall include a disclosure of such obstructed view.

4. If any licensee under this section demonstrates that their business provides a service to facilitate ticket transactions without charging any fees, surcharges or service charges above the established price, on every transaction, except a reasonable and actual charge for the delivery of tickets, then the fees for licensing under this section shall be waived.

## § 25.15. Bond.

The secretary of state shall require the applicant for a license to file with the application therefor a bond in due form to the people of New York in the penal sum of twenty-five thousand dollars, with two or more sufficient sureties or a duly authorized surety company, which bond shall be approved by the secretary of state. Each such bond shall be conditioned that the obligor will not be guilty of any fraud or extortion, will not violate directly or indirectly any of the provisions of this article or any of the provisions of the license or certificate provided for in this article, will comply with the provisions of this article and will pay all damages occasioned to any person by reason of any misstatement, misrepresentation, fraud or deceit or any unlawful act or omission of such obligor, his or her agents or employees, while acting within the scope of their employment, made, committed or omitted in connection with the provisions of this article in the business conducted under such license or caused by any other violation of this article in carrying on the business for which such license is granted. A suit to recover on the bond required to be filed by the provisions of this article may be brought in the name of the person damaged, upon the bond deposited with the department of state by such licensed person, in a court of competent jurisdiction. The amount of damages claimed by the plaintiff and not the penalty named in the bond shall determine the jurisdiction of the court in which the action is brought. One or more recoveries or payments upon such bond shall not vitiate the same but such bond shall remain in full force and effect, provided, however, that the aggregate amount of all such recoveries or payments shall not exceed the penal sum thereof. Upon the commencement of any action or actions against the surety upon any such bond for a sum or sums aggregating or exceeding the amount of such bond the secretary of state shall require a new and additional bond in like amount as the original one, which shall be filed with the department of state within thirty days after the demand therefor. Failure to file such bond within such period shall constitute cause for the revocation of the license pursuant to section 25.31 of this article theretofore issued to the licensee upon whom such demand shall have been made. Any suit or action against the surety on any bond required by the provisions of this section shall be commenced within one year after the cause of action shall have accrued.

## § 25.17. Supervision and regulation.

The secretary of state shall have power, upon complaint of any person or on his or her own initiative, to investigate the business, business practices and business methods of any such licensee which relates to this state's or any other state's ticket resale law, or in regards to ticket resale practices generally. Each such licensee shall be obliged, on the reasonable request of the secretary of state, to supply such information as may be required concerning his or her business, business practices or business methods provided that the information requested is related to the complaint which forms the basis of such investigation. Each operator of any place of entertainment shall also be obliged, on request of the secretary of state, to supply such information as may be required concerning the business, business practices or business methods of any licensee provided that the information requested is related to the complaint which forms

the basis of such investigation. The secretary of state shall have the power to promulgate such rules and regulations as may be deemed necessary for the enforcement of this article.

## § 25.19. Posting of license or certificate.

Immediately upon the receipt of the license or certificate issued pursuant to this article by the secretary of state, the licensee named therein shall cause such license to be posted and at all times displayed in a conspicuous place in the principal office of such business for which it is issued, and shall cause the certificate for each branch office, bureau, agency or sub-agency to be posted and at all times displayed in a conspicuous place in such branch office, bureau, agency or sub-agency for which it is issued, so that all persons visiting such principal office, branch office, bureau, agency or sub-agency may readily see the same, and if such licensee does business on the internet, to provide a hyperlink displayed in a conspicuous manner to a scanned copy of such license. Such license or certificate shall at all reasonable times be subject to inspection by the secretary of state or his or her authorized inspectors. It shall be unlawful for any person, firm, partnership or corporation holding such license or certificate to post such license or certificate or to permit such certificate to be posted upon premises other than those described therein or to which it has been transferred pursuant to the provisions of this article or unlawfully to alter, deface or destroy any such license or certificate.

## § 25.21. Change of office location.

In the event of a change in the location of the premises covered by license or certificate issued under this article, the department of state shall be duly notified in writing of such change within twenty-four hours thereafter. The secretary of state shall cause to be written or stamped across the face of such license or certificate a statement to the effect that the holder of such license has removed on the date stated in such written notice such principal office, branch office, bureau, agency or sub-agency from the place originally described in such license or certificate to the place described in such written notice, and such license or certificate with the endorsement thereon shall be returned to the licensee named therein. No tickets shall be sold at any place other than places for which a license or certificate provided for by this article has been issued and posted.

## § 25.23. Posting of price lists; information to purchaser.

In every principal office or branch office, bureau, agency or sub-agency of any licensee under this article, there shall be conspicuously posted and at all times displayed a price list showing the established price charged by the operator of the place of entertainment for which a ticket is being sold by such licensee, together with the price being charged by such licensee for the resale of such ticket, so that all persons visiting such place may readily see the same. The licensee shall also on request furnish each purchaser of a ticket with a receipt showing the same information. Further, if the licensee conducts business through the use of the internet, the same price list, or hyperlink to the same, shall be conspicuously displayed on the internet page on which tickets are accessed. In addition the licensee shall publish in a conspicuous place, or hyperlink to on the internet a statement clearly detailing the required guarantees required by section 25.07 of this article.

## § 25.25. Records of purchases and sales.

Every licensee shall at all times keep full and accurate sets of records showing: (1) the prices at which all tickets have been bought and sold by such licensee; and (2) the names and addresses of

the person, firm or corporation from whom they were bought. Operators offering for initial sale tickets by means of an auction shall maintain a record of the price when known and the number of tickets and types of seats offered through auction. These records shall be made available upon request to the state attorney general, the secretary of state, or other governmental body with the express authority to enforce any section of this article; provided, however, that the records required to be maintained by this section shall be considered proprietary in nature and shall be governed by the protections set forth in subdivision five of section eighty-nine of the public officers law. These records shall be retained for a period of not less than ten years.

### § 25.27. Commissions to employees of places of entertainment.

No licensee, other person or entity, whether or not domiciled, licensed or registered within the state, shall pay to any officer or employee of any place of entertainment, any commission, gratuity or bonus in connection with the sale, delivery or payment of tickets or in connection with the business being done by such licensee, other person or entity, whether or not domiciled, licensed or registered within the state, in tickets of admission to such place.

### § 25.29. Unlawful charges in connection with tickets.

1. No operator of any place of entertainment, or his or her agent, representative, employee or licensee shall, if a price be charged for admission thereto, exact, demand, accept or receive, directly or indirectly, any premium or price in excess of the established price plus lawful taxes whether designated as price, gratuity or otherwise; provided, however: (a) nothing in this article shall be construed to prohibit a service charge by the operator or agents of the operator for special services, including but not limited to, sales away from the box office, credit card sales or delivery; and (b) nothing in this article shall be construed to prohibit an operator or its agent from offering for initial sale tickets by means of an auction.

2. In any prosecution under this section the attorney general shall have concurrent jurisdiction with any district attorney and in any such prosecution he or she or his or her deputy shall exercise all the powers and perform all the duties which the district attorney would otherwise be authorized to exercise or perform therein.

### § 25.30. Operator prohibitions.

1. A ticket is a license, issued by the operator of a place of entertainment, for admission to the place of entertainment at the date and time specified on the ticket, subject to the terms and conditions as specified by the operator. Notwithstanding any other provision of law to the contrary, it shall be prohibited for any operator of a place of entertainment, who offers for sale subscription or season ticket packages, to restrict by any means the resale of any tickets included in the subscription or season ticket package as a condition of purchase, as a condition to retain such tickets for the duration of the subscription or season ticket package agreement, or as a condition to retain any contractually agreed upon rights to purchase future subscription or season ticket packages that are otherwise conferred in the subscription or season ticket agreement. Furthermore, it shall be prohibited for any operator of a place of entertainment to deny access to a ticket holder who possesses a resold subscription or season ticket to a performance based solely on the grounds that such ticket has been resold.

2. Additionally, nothing in this article shall be construed to prohibit an operator of a place of entertainment from maintaining and enforcing any policies regarding conduct or behavior at or in connection with their venue. An operator shall be permitted to revoke or restrict season tickets

for reasons relating to violations of venue policies, including but not limited to, attempts by two or more persons to gain admission to a single event with both the cancelled tickets originally issued to a season ticket holder and those tickets re-issued as part of a resale transaction, and to the extent the operator may deem necessary for the protection of the safety of patrons or to address fraud or misconduct.

**§ 25.31. Suspension or revocation of licenses.**

1. Powers of department of state. The department of state may deny an application or may revoke or suspend a license issued pursuant to this article, impose a fine not exceeding one thousand dollars per violation payable to the department of state, issue a reprimand and order restitution upon proof to the satisfaction of the secretary of state that the holder thereof has: (a) violated any provision of this article or any rule or regulation adopted hereunder; (b) made a material misstatement in the application for such license; (c) engaged in fraud or fraudulent practices; (d) demonstrated untrustworthiness or incompetency; or (e) been convicted of serious offense or misdemeanor which, in the discretion of the secretary, bears such a relationship to licensure as to constitute a bar to licensure or renewal.

2. Determination of department of state. In the event that the department of state shall revoke or suspend any such license, or impose any fine or reprimand on the holder thereof, its determination shall be in writing and officially signed. The original of such determination, when so signed, shall be filed with the department of state and copies thereof shall be served personally or by certified mail upon the licensee or applicant and addressed to the principal place of business of such licensee.

3. No license shall be suspended or revoked nor shall any fine or reprimand be imposed, nor shall any application be denied, until after an opportunity for a hearing had before an officer or employee of the department of state designated for such purpose by the secretary of state upon notice to the licensee or applicant of at least ten days. The notice shall be served by certified mail and shall state the date and place of hearing and set forth the ground or grounds constituting the charges against the licensee or the reasons for the proposed denial of the application. The licensee or applicant shall have the opportunity to be heard in his or her defense either in person or by counsel and may produce witnesses and testify on his or her behalf. A stenographic record of the hearing shall be taken and preserved. The hearing may be adjourned from time to time. The person conducting the hearing shall make a written report of his or her findings and a recommendation to the secretary of state for decision. The secretary of state shall review such findings and the recommendation and, after due deliberation, shall issue an order accepting, modifying or rejecting such recommendation and dismissing the charges or suspending or revoking the license or imposing a fine or reprimand upon the licensee. For the purpose of this article, the secretary of state or any officer or employee of the department of state designated by him or her, may administer oaths, take testimony, subpoena witnesses and compel the production of books, papers, records and documents deemed pertinent to the subject of investigation.

**§ 25.33. Private right of action.**

Notwithstanding any right of action granted to any governmental body pursuant to this chapter, any person who has been injured by reason of a violation of this article may bring an action in his or her own name to enjoin such unlawful act, an action to recover his or her actual damages

or fifty dollars, whichever is greater, or both such actions. The court may award reasonable attorney's fees to a prevailing plaintiff.

## § 25.35. Criminal penalties.

1. (a) Any person, firm, corporation or other entity, whether or not domiciled, licensed or registered within the state, which is convicted of violating section 25.27 or 25.29 of this article shall be guilty of a class A misdemeanor punishable by a fine not to exceed one thousand dollars or two times the amount of the defendant's gain, to be determined pursuant to the procedures set forth in section 400.30 of the criminal procedure law, whichever is greater, or by a term of imprisonment not to exceed one year, or by both such fine and imprisonment. (b) Any person, firm, corporation or other entity, whether or not domiciled, licensed, or registered within the state, which is convicted of violating section 25.27 or 25.29 of this article, when the value of the commission, gratuity, bonus, premium or price unlawfully paid or accepted exceeds one thousand dollars for an event as defined in section 23.03 of this chapter, whether or not such payment is for tickets to a single performance of that event, shall be guilty of a class E felony, punishable by a term of imprisonment in accordance with the penal law, or by a fine of five thousand dollars or two times the amount of the defendant's gain, to be determined pursuant to the procedures set forth in section 400.30 of the criminal procedure law, whichever is greater, or by both such fine and imprisonment.

2. Any person, firm or corporation which is convicted of violating subdivision two of section 25.09 of this article shall be guilty of a misdemeanor punishable by a term of imprisonment not to exceed one year or by a fine not to exceed seven hundred fifty dollars on the first conviction; one thousand five hundred dollars on the second conviction; and two thousand dollars, on each subsequent conviction or by both such fine and imprisonment.

3. Any person, firm or corporation which is convicted of knowingly violating subdivision one of section 25.07 or section 25.13 or section 25.15 of this article shall be guilty of a misdemeanor punishable by a term of imprisonment not to exceed one hundred eighty days or by a fine not to exceed five hundred dollars on the first conviction; one thousand dollars on the second conviction; and two thousand dollars on each subsequent conviction or by both such fine and imprisonment.

4. Notwithstanding any other penalty which may be imposed for any other violation of this article, any person, firm or corporation which is convicted of violating section 25.11 of this article shall be guilty of a violation punishable by a fine not to exceed two hundred dollars on the first conviction; five hundred dollars on the second conviction; and one thousand dollars on each subsequent conviction.

5. Any person, firm or corporation which is convicted of violating subdivision one of section 25.09 of this article shall be guilty of a violation punishable by a fine not to exceed five hundred dollars.

6. Any person, firm or corporation which is convicted of violating any other section of this article shall be guilty of a violation punishable by a fine not to exceed two hundred fifty dollars.

## APPENDIX B

**This appendix includes Arts and Cultural Affairs Law Article 25, which will become effective on May 16, 2010, upon the repeal of Article 25 as currently in effect.**

§ 25.01. Matters of public interest. It is hereby determined and declared that the price of or charge for admission to theatres, places of amusement or entertainment, or other places where public exhibitions, games, contests or performances are held is a matter affected with a public interest and subject to the supervision of the appropriate political subdivisions of the state for the purpose of safeguarding the public against fraud, extortion, exorbitant rates and similar abuses.

§ 25.03. Reselling of tickets of admission; licenses; fees. 1. No person, firm or corporation shall resell or engage in the business of reselling any tickets of admission or any other evidence of the right of entry to a theatre, place of amusement or entertainment, or other places where public exhibitions, games, contests or performances are held, or own, conduct or maintain any office, branch office, bureau, agency or sub-agency for such business without having first procured a license or certificate therefor from the commissioner of licenses of the political subdivision in which such person intends to conduct such business and if there be no such commissioner, then the chief executive officer thereof shall be deemed to be the commissioner for the purposes of this article. A license for the principal office shall be granted upon the payment by or on behalf of the applicant of a fee of two hundred dollars and shall be renewed upon the payment of a like fee annually; and a certificate shall be granted for each branch office, bureau, agency or sub-agency, upon payment by or on behalf of an applicant of a fee of fifty dollars and shall be renewed upon the payment of a like fee annually. Such license or certificate shall not be transferred or assigned, except by permission of such commissioner. No change in the location of the premises covered by such license or certificate shall be made, except by permission of such commissioner, and upon the payment of a fee of ten dollars. Such license or certificate shall run to the first day of January next ensuing the date thereof, unless sooner revoked by such commissioner. Such license or certificate shall be granted upon a written application setting forth such information as such commissioner may require in order to enable him to carry into effect the provisions of this article and shall be accompanied by proof satisfactory to such commissioner of the moral character of the applicant. No license or certificate shall be issued for any office or branch office, bureau, agency or sub-agency unless such office or branch office, bureau, agency or sub-agency shall be a suitable place for the conduct of said business and shall meet with the approval of such commissioner.

2. This section shall not apply to any person, firm or corporation which purchases any tickets as defined in this section with the intent of using the tickets solely for their own use or the use of their invitees, employees and agents and resells them at a price not in excess of that permitted by section 25.13 of this article should they no longer be able to use them.

§ 25.05. Ticket speculators. Any person who:

1. Conducts on or in any street in a city or in the county of Nassau the business of selling or offering for sale any ticket of admission or any other evidence of the right of entry to any

performance or exhibition in or about the premises of any theatre or concert hall, place of public amusement, circus or common show; or

2. Solicits on or in any street in a city or in the county of Nassau by words, signs, circulars or other means any person to purchase any such ticket or other evidence of the right of entry; or

3. In or from any building, store, shop, booth, yard, garden or in or from any opening, window, door, hallway, corridor or in or from any place of ingress or egress to or from any building, place of business, store, shop, booth, yard or garden in a city or in the county of Nassau indicates, holds out or offers for sale to any person or persons on or in the street by word of mouth, crying, calling, shouting or other means that such ticket or other evidence of the right of entry may be purchased in such building, store, shop, booth, yard, garden or any other place; or

4. In or from any such place or places in a city or in the county of Nassau solicits by word of mouth, crying, calling, shouting or other means any person on or in the street to purchase any such ticket or other evidence of the right of entry, is guilty of a misdemeanor.

§ 25.07. Bond. The commissioner shall require the applicant for a license to file with the application therefor a bond in due form to the people of the political subdivision in which such license is issued in the penal sum of one thousand dollars, with two or more sufficient sureties or a duly authorized surety company, which bond shall be approved by such commissioner. Each such bond shall be conditioned that the obligor will not be guilty of any fraud or extortion, will not violate directly or indirectly any of the provisions of this article or any of the provisions of the license or certificate provided for in this article, will comply with the provisions of this article and will pay all damages occasioned to any person by reason of any misstatement, misrepresentation, fraud or deceit or any unlawful act or omission of such obligor, his agents or employees, while acting within the scope of their employment, made, committed or omitted in connection with the provisions of this article in the business conducted under such license or caused by any other violation of this article in carrying on the business for which such license is granted. Such commissioner shall keep books wherein shall be entered in alphabetical order all licenses granted and all bonds received by him as provided for in this article, the date of the issuance of such license and the filing of such bonds, which record shall be open to public inspection. A suit to recover on the bond required to be filed by the provisions of this article may be brought in the name of the person damaged, upon the bond deposited with the political subdivision by such licensed person, in a court of competent jurisdiction. The amount of damages claimed by the plaintiff and not the penalty named in the bond shall determine the jurisdiction of the court in which the action is brought. One or more recoveries or payments upon such bond shall not vitiate the same but such bond shall remain in full force and effect, provided, however, that the aggregate amount of all such recoveries or payments shall not exceed the penal sum thereof. Upon the commencement of any action or actions against the surety upon any such bond for a sum or sums aggregating or exceeding the amount of such bond the commissioner shall require a new and additional bond in like amount as the original one, which shall be filed with the commissioner within thirty days after the demand therefor. Failure to file such bond within such period shall constitute cause for the revocation of the license theretofore issued to the licensee upon whom such demand shall have been made. Any suit or action against the surety

on any bond required by the provisions of this section shall be commenced within one year after the cause of action shall have accrued.

§ 25.09. Suspension or revocation of licenses. In the event that any licensee shall be guilty of any fraud or misrepresentation or otherwise violate any of the provisions of this article or any other law or local ordinance, such commissioner shall be empowered, on giving five days' notice by mail to such licensee, and on affording such licensee an opportunity to answer the charges made against him, to suspend or revoke the license issued to him.

§ 25.11. Supervision and regulation. Such commissioner shall have power, upon complaint of any citizen or on his own initiative, to investigate the business, business practices and business methods of any such licensee if in the opinion of such commissioner such investigation is warranted. Each such licensee shall be obliged, on request of such commissioner, to supply such information as may be required concerning his business, business practices or business methods. Each owner, operator, producer, manager or employee of any theatre, theatrical company, place of amusement or entertainment, or other place where public exhibitions, games, contests or performances are held shall also be obliged, on request of such commissioner, to supply such information as may be required concerning the business, business practices or business methods of any licensee. Such commissioner, in enforcing this article, shall have the power to promulgate such rules and regulations as may be deemed necessary for the protection of the public.

§ 25.13. Printing price on ticket. Every person, firm or corporation who owns, operates or controls a theatre, place of amusement or entertainment, or other place where public exhibitions, games, contests or performances are held shall, if a price be charged for admission thereto, print on the face of each such ticket or other evidence of the right of entry the price charged therefor by such person, firm or corporation. Such person, firm or corporation shall likewise be required to print or endorse thereon the maximum premium (not to exceed two dollars, plus lawful taxes), at which such ticket or other evidence of the right of entry may be resold or offered for resale. It shall be unlawful for any person, firm or corporation to resell or offer to resell such ticket or other evidence of the right of entry at any premium or price in excess of such maximum premium printed or endorsed thereon, plus lawful taxes, or so that the ultimate price to the purchaser of such ticket shall exceed a sum in excess of two dollars over and above the original price charged for admission as printed on the face of each such ticket or other evidence of the right of entry, plus lawful taxes.

§ 25.15. Posting of license or certificate. Immediately upon the receipt of the license or certificate issued pursuant to this article by such commissioner, the licensee named therein shall cause such license to be posted and at all times displayed in a conspicuous place in the principal office of such business for which it is issued, and shall cause the certificate for each branch office, bureau, agency or sub-agency to be posted and at all times displayed in a conspicuous place in such branch office, bureau, agency or sub-agency for which it is issued, so that all persons visiting such principal office, branch office, bureau, agency or sub-agency may readily see the same. Such license or certificate shall at all reasonable times be subject to inspection by

such commissioner or his authorized inspectors. It shall be unlawful for any person, firm, partnership or corporation holding such license or certificate to post such license or certificate or to permit such certificate to be posted upon premises other than those described therein or to which it has been transferred pursuant to the provisions of this article or unlawfully to alter, deface or destroy any such license or certificate.

§ 25.17. Removal of office. If the holder of an unexpired license or certificate issued pursuant to this article shall remove the office, branch office, bureau, agency or sub-agency to a place other than that described in the license or certificate, he shall within the twenty-four hours immediately following such removal, give written notice of such removal to such commissioner, which notice shall describe the premises to which such removal is made and the date on which it was made, and send such license or certificate to such commissioner, at his office in the political subdivision, and such commissioner shall cause to be written or stamped across the face of such license or certificate a statement to the effect that the holder of such license has removed on the date stated in such written notice such principal office, branch office, bureau, agency or sub-agency from the place originally described in such license or certificate to the place described in such written notice, and such license or certificate with the endorsement thereon shall be returned to the licensee named therein. No tickets, or evidence or tokens thereof, shall be sold at any place other than places for which a license or certificate provided for by this article has been issued and posted.

§ 25.19. Posting of price lists; information to purchaser. In every principal office or branch office, bureau, agency or sub-agency of any licensee under this article, there shall be conspicuously posted and at all times displayed a price list showing the price charged by the person, firm or corporation owning, operating or controlling the theatre, place of amusement or entertainment, or the place where the public exhibition, game, contest or performance for which a ticket is being sold by such licensee, together with the price being charged by such licensee for the resale of such ticket, so that all persons visiting such place may readily see the same. The licensee shall also on request furnish each purchaser of a ticket with a receipt showing the same information.

§ 25.21. Records of purchases and sales. Every licensee shall at all times keep full and accurate sets of records showing the prices at which all tickets have been bought and sold by such licensee and the names and addresses of the person, firm or corporation from whom they were bought.

§ 25.23. Commissions to employees of theatres. No licensee shall pay to any officer or employee of any theatre or place of amusement or entertainment or other place where public exhibitions, games, contests or performances are held, or to any producer or manager or employee of any theatrical or other exhibition or theatrical company, any commission, gratuity or bonus in connection with the sale, delivery or payment of tickets or in connection with the business being done by such licensee in tickets of admission to such places.

- 48 -

§ 25.25. Violations; penalties. 1. Every person, firm or corporation who resells any such ticket or other evidence of right of entry or engages in the business of reselling any such ticket or other evidence of the right of entry, without first having procured the license prescribed and filing of a bond required by this article shall be guilty of a misdemeanor. Every person, firm or corporation who violates any provision of this article shall be guilty of a misdemeanor. A conviction for any violation hereof shall be punishable by a fine not to exceed two hundred fifty dollars for the first violation, five hundred dollars for the second violation and one thousand dollars for any subsequent violation or by imprisonment for a period not to exceed one year, or both such fine and imprisonment as herein provided.

2. Notwithstanding the provisions of subdivision one of this section, any person who has not previously been convicted of violating this section and who sells less than six tickets shall be guilty of a violation, and upon conviction shall be punishable by a fine not to exceed one hundred dollars.

§ 25.27. Unlawful charges in connection with theatre tickets. 1. Any owner, operating lessee, operator, manager, treasurer or assistant treasurer of any theatre wherein public performances are held, or of any stadium, arena, garden or other place of amusement showing sporting events, or his agent, representative, employee or licensee who, if a price be charged for admission thereto, exacts, demands, accepts or receives, directly or indirectly, any premium or price in excess of the regular or established price or charge, plus lawful taxes, as printed upon the face of each ticket or other evidence of the right of entry thereto, whether designated as price, gratuity or otherwise, shall be guilty of a misdemeanor. A conviction for each violation hereof shall be punishable by a fine not to exceed five hundred dollars or by imprisonment for a period not to exceed one year, or both.

2. The provisions of this section shall also apply to the sale of theatre tickets and tickets for sporting events to persons licensed to resell theatre tickets and tickets for sporting events, pursuant to the provisions of this article.

3. In any prosecution under this section the attorney general shall have concurrent jurisdiction with any district attorney and in any such prosecution he or his deputy shall exercise all the powers and perform all the duties which the district attorney would otherwise be authorized to exercise or perform therein.

# APPENDIX C

This appendix sets forth the details of the Department's research into ticket pricing and availability on the primary and secondary market.

1.      Ticket availability on the primary market

     A.      Taylor Swift

The Department researched ticket sales on the primary market to Taylor Swift's concerts on May 12, 2010 and May 13, 2010 in Newark, New Jersey and May 14, 2010 and May 15, 2010 in Uniondale, New York.   On November 5, 2009 and November 9, 2009, the Department researched ticket availability to these concert dates. While ticket availability was limited in New York and New Jersey, there were less tickets available on the primary market in New York State. The only seat located for the two New York concerts was for the May 14, 2010 show in the uppermost level of Nassau Coliseum (section 320, row P).  The floor, 100 and 200 levels of the arena were sold out for the May 14, 2010 show and the May 15, 2010 date was sold out completely.

The following tickets were available for the May 12, 2010 concert in New Jersey: a seat in the lower level of the Prudential Center (section 1, row 16), one of the mezzanine (section 113, row 6) and one in the upper level (section 212, row 5).  For the May 13, 2010 concert, the Department was also able to locate three tickets.  Again, the available tickets were for the lower (section 2, row 24), mezzanine (section 128, row 8) and upper levels (section 212, row 7) of the Prudential Center.  The floor level was sold out for both shows.

     B.      Lady GaGa

On November 13, 2009, the day tickets went on sale for the New York concert, the Department attempted to locate tickets through the primary seller.  The only ticket located was in the upper level of Radio City Music Hall (third mezzanine, row F).  On November 12, 2009, the Department researched ticket availability through the primary market to the December 3, 2009 concert in Camden, New Jersey.  Although the concert was less than a month away, 14 tickets were available for seats in the stage pit.

     C.      Mamma Mia!

The Winter Garden Theater, where Mamma Mia! is being shown in New York, is divided into two seating sections, the orchestra and mezzanine. On November 13, 2009, the Department located three available seats through the primary seller for the New York City production: one in the mezzanine and two in the orchestra.  The same day, the Department researched ticket availability at the Colonial Theater in Boson, Massachusetts.  Only one ticket was located through the primary seller (row S, right orchestra).

D.     Miley Cyrus

Ticket availability for Miley Cyrus' concerts was better in New York than in Georgia and New Jersey.  For the November 18, 2009 and November 19, 2009 concerts in New York, the Department located seats in the upper level of Nassau Coliseum for both dates through the primary market.  A search for tickets on November 12, 2009 located a seat in section 322, row L while a search for tickets to the November 19, 2009 show located a seat in section 317.

On November 3, 2009, the Department researched ticket availability to Miley Cyrus' November 7 and November 8, 2009 concerts at the Prudential Center in Newark, New Jersey. No tickets were available through the primary seller for either date.   Similarly, a search for tickets on November 12, 2009 for tickets to Cyrus' November 29, 2009 concert in Atlanta, Georgia, yielded no results.

E.     Trans-Siberian Orchestra

For the December 11, 2009 Trans-Siberian Orchestra concert in New York, the Department located tickets on the floor and in each of the upper levels.  Similarly, for the November 18, 2009, November 19, 2009 and December 12, 2009 concerts in Rhode Island, Massachusetts and New Jersey, respectively, the Department located tickets on the floor and in each of the upper levels of all arenas.

2.     Ticket availability on the secondary market

A.     Mamma Mia

On November 23, 2009, the Department researched ticket availability to the Broadway theater production, 'Mamma Mia!' on the secondary market.  One representative resale website advertised a total of 86 tickets to the New York City show. Many more tickets (247) were available    through    this    same    online    reseller    for    the    Boston    production. (www.coasttocoasttickets.com).

B.     Lady GaGa

On the date ticket availability was researched, one representative reseller advertised a total of 603 available tickets to the New York concert. (www.tickets.gruvr.com).  Availability in New Jersey was substantially less with one representative reseller advertising 143 available tickets.  (www.ticketbroker.com).

C.     Taylor Swift

For Taylor Swift's May 14, 2009 concert in New York, one ticket reseller advertised 254 floor tickets and had hundreds of others available in other sections of Nassau Coliseum (www.coasttocoasttickets.com).  Another online reseller offered 89 floor tickets including two in the front row of the center section (www.eventinventory.com) while another offered up to 6 tickets in the front row on the center section. (www.ticketnetwork.com).  All of the ticket reseller websites searched offered a wide assortment of tickets for all areas of Nassau Coliseum.

Similar results were found when researching ticket availability for Taylor Swift's second New York State concert.   While there were no tickets available through the primary seller for the May 15, 2009 concert, hundreds of tickets were available through online resellers for all sections of Nassau Coliseum. One ticket reseller alone advertised 224 tickets in the section 300 portion of the Coliseum, 131 tickets in section 200, 145 tickets in section 100 and 145 tickets on the floor.  (www.eventinventory.com).

Search results for tickets to Taylor Swift's New Jersey concerts were similar.  For the May 12, 2010 concert, although no floor level seats were available through the primary market, hundreds of floor seats were being offered for sale by ticket resellers.  One online website (www.uscity.net) offered 293 floor seats, including 7 in the front row of the center section of the arena while another offered 172 floor seats, with 7 seats in the front row, center section. (www.empiretickets.com).

For Swift's May 13, 2010 New Jersey concert, ticket resellers similarly advertised hundreds of floor and other tickets.   One website advertised 226 floor seats (www.funnewjersey.com) while another advertised 213 floor tickets(www.uscity.net).  Another ticket reseller advertised 111 tickets in the upper level of the arena (200 level), 322 in the mezzanine and 539 in the lower level. (www.funnewjersey.com).

D.     Trans-Siberian Orchestra

For the New York production, one representative ticket reseller website advertised 96 floor tickets, 78 tickets to the 100 level, 40 tickets to the 200 level and 101 tickets to the 300 level of the arena. (www.ticketbroker.com).  In Rhode Island, one representative ticket reseller advertised 89 floor tickets, 98 tickets to the 100 level and 37 tickets to the 200 level of the Dunkin Donuts Center. (www.ticketsgenie.com).  In Massachusetts, 85 floor tickets, 82, 100 level tickets and 29 200 level tickets were advertised seven days prior to the November 19, 2009 concert. (www.ticketbroker.com)  By comparison, 30 days prior to the December 12, 2009 New Jersey concert, the same resale site advertised 101 floor, 249 mezzanine and 205 tickets to the 200 level of the arena.

E.    Miley Cyrus

On November 13, 2009, one representative ticket reseller advertised 68 tickets to Cyrus' November 18, 2009 concert in Uniondale, New York. (Coasttocoasttickets.com).  All of these tickets were on the floor and lower levels of Nassau Coliseum.  By comparison, on November 3, 2009, five days before Cyrus' November 8, 2009 concert in New Jersey, the same representative reseller website advertised 90 available tickets.  As in New York, all of these tickets were on the floor and in more desirable sections of the arena.

For Cyrus' November 29, 2009 concert in Atlanta, Georgia, two online resellers each advertised a total of 40 available seats. (Coasttocoasttickets.com; frontrowking.com).  Twenty-two seats were located on the floor, 8 were located in the lower level, 2 in the upper 200 section, 4 in the upper 300 section and 4 were located in a suite.

3.    Ticket prices on the primary market

A.    Taylor Swift

Tickets to Taylor Swift's New York concerts were $69.50, $59.50 and $25.00 plus other incidental charges.   The list price of tickets to the New Jersey concerts ranged in price from $72.50 to $28.00 as follows: (1) $72.50 for floor and lower level; (2) $72.50 to $28.00 for mezzanine level seats and, (3) $28.00 to $62.50 for seats in the upper level.

B.    Playhouse Disney

In New York, ticket prices ranged from $15 to $55.  In New Jersey, front row tickets were $65, floor tickets were $42, tickets to the lower level were $28 and tickets to the upper level were $15.

C.    Mamma Mia!

In New York, tickets sold through the primary seller for $62.75 through $131.50 for seats in the mezzanine section and $131.50 for seats in the orchestra. In Massachusetts, the initial list price of theater tickets was $25.00 through $88.50.

D.    Miley Cyrus

In New York, tickets were sold for the following prices: $79.50 for floor and 100 level seating, $59.50 through $79.50 for 200 level seating and $39.50 through $59.50 for 300 level seating. In New Jersey and Georgia, tickets also ranged in price from $39.50 to $79.50. Incidental fees were charged in all three states.

E.    Trans-Siberian Orchestra

- 53 -

Pricing on the primary market was mixed for the Trans-Siberian Orchestra.  In New York, tickets were sold to the December 11, 2009 concert at Nassau Coliseum for prices ranging from \$23.50 to \$66.00 plus taxes and a convenience charge.  In New Jersey, tickets to the December 12, 2009 concert in East Rutherford, New Jersey ranged in price from \$25.00 to \$72.00 plus a convenience charge.  Tickets to the November 18, 2009 concert in Rhode Island were priced at \$40.50, \$52.50 and \$62.50 plus a facility fee and convenience charge.  Finally, in Massachusetts, tickets to the November 19, 2009 concert at the DCU Center in Worcester, ranged in price from \$38.50 to \$60.50 plus facility and convenience charges.  Of the four states, New Jersey had the most expensive list ticket (\$72).  New York had the next highest price (\$66), but also sold tickets for the least amount (\$23.50). Rhode Island had the next highest ticket price (\$62.50, and Massachusetts the least (\$60.50).  These results fail to provide conclusive evidence that the existence of a price cap impacts the price at which tickets are sold on the primary market.

4.      Ticket prices on the secondary market

        A.      Playhouse Disney Live!

        On the secondary market, tickets to the Albany, New York showing of Playhouse Disney Live! ranged in price from \$146-\$456.  In New Jersey, tickets on the secondary market ranged from \$37-\$236. (www.ticketliquidator.com, www.coasttocoasttickets.com).

        B.      Lady GaGa

        The resale price of concert tickets to Lady Gaga was higher in New York than in New Jersey.  A search of one representative resale website located tickets to the New York City concert ranging in price from \$116 to \$1371. (www.tickets.gruvr.com).  By comparison, tickets to the New Jersey concert were advertised on another representative resale website for prices ranging from \$110 to \$575. (www.ticketbroker.com).

        C.      Miley Cyrus

        To compare the price of tickets to Miley Cyrus' concerts in New York, New Jersey and Georgia, the Department researched the cost of tickets through the secondary market five days prior to each of the scheduled concerts.  Of the three states, New York had the least expensive tickets on the resale market with ticket prices ranging from \$206 to \$765.  By comparison, resale ticket prices in New Jersey ranged from \$312 to \$801 and tickets in Georgia were \$294 through \$1025.

5.      State price caps were routinely exceed on internet resale sites

        A.      Taylor Swift

The list price of tickets to Taylor Swift's New Jersey concerts was: (1) $72.50 for floor and lower level; (2) $72.50 to $28.00 for mezzanine level seats and, (3) $28.00 to $62.50 for seats in the upper level.  In researching the resale market for tickets to Taylor Swift's concerts in New Jersey, the Department applied the price cap to the list price of Swift's New Jersey concert tickets.  Doing so results in the following maximum ticket prices: (1) $108.75 for registered ticket brokers and $75.50 for unregistered brokers for floor and other tickets initially priced at $72.50; (2) $93.75 for registered ticket brokers and $65.50 for unregistered ticket brokers for tickets which were originally priced at $62.50,  and (3) $42.00 for registered brokers and $31.00 for unregistered brokers for tickets originally priced at $28.00. New Jersey exempts online transactions from its statutory price-cap.  In researching ticket availability to events in that state, the Department observed that the price caps were routinely exceeded on resale websites.

One online reseller offered upper level seats (200 level) to the May 12, 2009 concert for prices ranging from $110-$500, tickets in the 100 level from $115 to $500 and floor seats from $150 to $850. (www.tickets.uscity.net.)  Tickets to the May 13, 2009 concert were priced similarly on another online resale site where tickets were being resold as follows: seats in the 200 level from $118 to $320, seats in the 100 level from $136 to $334, seats in the lower level from $138 to $587 and floor tickets from $182 to $1,225. (www.funnewjersey.com).

B.      Miley Cyrus

The state of Georgia also caps the resale price of tickets.  In researching tickets to Miley Cyrus' concerts, the Department observed that online ticket resellers were routinely disregarding the state price cap.  In Georgia, tickets may not be resold for more than the face value of the ticket plus a service fee of not greater than $3.00. (Ga. Code Ann, section 43-4B-25).  Tickets were initially sold to the Georgia concert for $39.50, $59.50 and $79.50.  As such, the maximum resale price permitted under Georgia state law is $82.50 for those tickets initially sold for $79.50. The Department found numerous tickets for prices in excess of what was allowed under State law.

On November 12, 2009, the Department researched ticket pricing to Cyrus' November 29, 2009 concert in Atlanta, Georgia.  Floor tickets were advertised for prices ranging from $455 to $1,250 per ticket; far in excess of the $82.50 price permitted by state law. (www.frontrowking.com and www.coasttocoasttickets.com).  Tickets for the other sections of the arena were similarly inflated and were being sold by these two reseller sites prices ranging from $211 to $537.

C.      Trans-Siberian Orchestra

Like New Jersey, Georgia and Massachusetts, the state of Rhode Island caps the price at which tickets to places of entertainment may be resold.   In Rhode Island, ticket resale is generally prohibited at a price greater than the list price, including taxes, and a reasonable

service charge not to exceed three dollars ($3.00) or ten percent (10%) of the price printed on the ticket, whichever is greater. (Gen Laws § 5-22-26).  Tickets to the November 18, 2009 presentation of Trans-Siberian Orchestra, were routinely being sold in excess of this amount on resale websites.

In Rhode Island, floor tickets to the November 18, 2009 evening presentation of the Trans Siberian Orchestra  were originally sold for $50.50 to $60.50.   Applying the maximum resale price of 10% to these prices results in a maximum permitted resale price of $66.55 for those prices originally costing $60.50.  Reseller websites advertised floor tickets for prices between $28.00 and $302.00; both below and significantly higher than the list and statutorily permitted resale price.  Tickets to the lower section ranged in price from $38.50 to $60.50 on the primary market.  Ticket resellers sold seats to this section from between $35.00 and $234. Tickets to the upper section originally sold for between $38.50 and $50.50.  On resale websites, the price range for tickets to the upper level ranged from $67.00 to $180.

As with the resale of tickets to Taylor Swift's New Jersey Concerts, ticket resale websites were offering tickets to the New Jersey presentation of the Trans-Siberian Orchestra for more than permitted by state law. Tickets to the November 19, 2009 Trans Siberian Orchestra concert in Worcester, Massachusetts were similarly being resold for prices in excess of the maximum permitted resale price of $2.00 over the list ticket price.

In New Jersey, The list price of floor level tickets to the Izod Center in East Rutherford, New Jersey were $62.00 to $72.00.  Ticket resale websites advertised floor tickets ranging in price from $130 to $320.  Tickets to the lower level ranged from $62.00 to $72.00 on the primary market.  By comparison, on resale websites, tickets to the lower level ranged from $73.00 to $338.  Tickets to the upper level were priced at $25.00 to $72.00 through Ticketmaster.  Reseller websites charged between $35.00 and $279 for these same seats.

In Massachusetts, The list price of floor tickets to the November 19, 2009 concert was $50.50 to $60.50.  Resale websites advertised floor tickets for between $60.00 and $390.  Tickets to the lower level originally sold for $38.50 to $60.50.  Tickets were sold on the secondary market for the lower level for $75.00 to $305.  Tickets to the upper level were similarly inflated and were advertised on the resale market for $84.00 to $235.  Tickets to the upper level were originally sold on the primary market for $38.50 to $60.50.

D.     Mamma Mia!

In researching tickets to Mamma Mia!, the Department observed similar violations of state law for tickets being sold to the Massachusetts production.  Massachusetts state law prohibits licensed ticket brokers from reselling tickets in excess of the face value of the ticket plus $2.00 in service fees. (Gen Law ch. 140 section 185D). The list price of tickets to the Massachusetts showings of Mamma Mia! was $25.00 to $45 for balcony seating, $45.00 to $88.50 for seats in mezzanine and $88.50 for seats on the floor of the arena. One representative

resale website offered Mamma Mia! ticket for $78-$221 for balcony seats. (www.coasttocoasttickets.com).  The maximum permitted price for this level of seating was $47.00.  This same resale site advertised tickets in the mezzanine level from $112 to $250 and tickets in the orchestra from $146 to $339.  All of these advertised prices exceeded the state resale price cap.

6.      Prices were generally higher on the secondary market

Prices on the secondary market to Miley Cyrus' New York concerts were significantly higher than the initial list price.  Floor tickets to this event originally sold for $79.50.  On November 10, 2009, one representative online reseller advertised 39 floor tickets to Miley Cyrus' first New York Concert for prices ranging from $235.00 to $756.00. (www.coasttocoasttickets.com).

Tickets to Taylor Swift's New York concerts were also being sold in excess of list price. While the list price of floor tickets was $69.50, one online reseller offered two floor tickets for $1,456 and six for $1,593.00. (www.coasttocoasttickets.com).  The pricing by this particular reseller was not an anomaly.  Another online reseller offered two tickets to seats in the front row of the center section of Nassau Coliseum for a price of $2,500. (www.eventinventory.com).  Yet another online reseller offered up to 6 tickets in the front row on the center section for a price of $2,100 per ticket.  (www.ticketnetwork.com). Stubhub.com advertised one floor ticket for a price of $3,500. Seats in the other sections of Nassau Coliseum were, similarly, priced higher by ticket resellers.  Tickets to seats in the upper level of Nassau Coliseum ranged in price from $105 to $315; seats in the 200 section ranged from $185 to $500 and seats in the100 section ranged from $185 to $625.

For the December 11, 2009 Trans-Siberian Orchestra concert in New York, although numerous tickets were available on the primary market, ticket resellers were reselling tickets in excess of list price.  Tickets to the floor level of Nassau Coliseum were priced at $56.00 to $66.00 plus taxes and a convenience charge.  On resale websites, tickets to the floor ranged in price from $105 to $345.  On the primary market, tickets in the 100 section of Nassau Coliseum were priced from $56.00 to $66.00.  Ticket resellers charged between $115.00 to $255 for tickets to this same  section.  Similarly, resale websites charged between $110-$160 for tickets to the 200 level of Nassau Coliseum.  Tickets to this section were sold by the primary seller for between $23.50 and $66.00 per ticket.

The inflation of resale ticket prices was observed even for seats that were comparable to those which the Department found on the primary market.  For Taylor Swift's New York concerts, the only seat located was for the May 14, 2010 show in the uppermost level of Nassau Coliseum (section 320, row P). The price of this ticket was $74.55.  The Department was able to locate comparable seats through online ticket resellers as follows: (1) section 320, row O for $150 (www.eventinventory.com); (2) 320, row O for $117 (www.coasttocoasttickets.com);

- 57 -

section 320, row K for $190 (www.eventinventory.com); and section 320, row K for $167.00 (www.stubhub.com).

The inflation of ticket prices on the secondary market was not observed in New York alone. Similar results were found in states with price caps. The Department located several tickets to the May 12, 2010 concert in Newark, New Jersey including one in the 16th row of section one for a price of $72.50 plus a convenience charge of $11.80. The Department located the following comparable seats through online ticket resellers: (1) section 1, row 13 for $155.00 (www.uscity.net); (2) section 1, row 12 for $306.00 (www.empiretickets.com); (3) section 1, row 20 for $160 (www.uscity.net); and (4) section 1, row 23 for $154 (www.uscity.com).

The Department also located a ticket in section 113, row 6 of the mezzanine for the May 12, 2010 concert for a price of $72.50 plus a convenience charge.  Online reseller websites offered tickets in this same section for considerably more: $185 for a 5th row seat (www.uscity.com), $206.00 for another seat in the 5th row (www.empiretickets.com), $210 for a seat in the 4th row (www.tickets.com) and $145 and $148 for seats in the 4th row (www.uscity.com).

Ticket prices for seats in the upper level of the Prudential Center were similarly priced higher by ticket resellers. Ticketmaster offered a ticket in the 5th row of section 212 for a price of $62.50 plus a convenience charge. One online reseller offered a seat in this same row of section 212 for $125.00. (www.uscity.net) Another offered a ticket for a seat in the 4th row for $136.00. (www.tickets.now).

Three seats were available through Ticketmaster for Taylor Swift's May 13, 2010 concert in Newark, New Jersey.  The Department was able to locate seats through online resellers that were comparable to the quality of seats available through the primary seller.  As with the May 12, 2010 concert date, the price for purchasing a ticket from a reseller was higher than purchasing a comparable ticket through Ticketmaster.  One of the tickets advertised by the primary seller was for a seat in section 2, row 24 for $72.50 plus a convenience charge.  Online resale sites advertised comparable seats in section 2, row 20 ranging in price from $129 to $229.

The Department located a seat in section 128, row 8 through Ticketmaster.com for a price of $72.50.  Online resellers offered tickets in this same section and row for considerably higher: $136.00, 143.00 (www.funnewjersey.com), $148.00 and $175.00 (www.uscity.net) and $201.00 (www.stubhub.com).  Prices for upper level seats were also higher on reseller websites.  The Department located a seat in section 212, row 7 for $62.50.  Comparable seats were located on a ticket reseller website for $123 and $156.00. (www.uscity.net).

Similar results were obtained when researching ticket pricing to Miley Cyrus' concerts. Ticket reseller websites, offered tickets in the 300 level of Nassau Coliseum for the November 18, 2009 concert that were comparable to the ticket located by the Department on Ticketmaster.com (section 324, row 12) for $59.50 plus fees and taxes. Coasttocoasttickets.com

advertised comparable seats in section 325 for $241 each. A second reseller site, advertised tickets to section 325 for a price of $245 per ticket. (www.frontrowking.com)

7.      The change in resale ticket prices as the event nears

The Department researched tickets to Miley Cyrus' concerts in New York and in two states with price caps, New Jersey and Georgia. On November 17, 2009, the day prior to the first of Cyrus' New York concerts, coasttocoasttickets.com, which had advertised floor tickets on November 12, 2009 for prices ranging from $235-$756 had actually increased ticket prices. On November 17, tickets to two seats in section B2 of the floor section had been increased from $255 to $294 per ticket and tickets to section 101, row H had been increased from $417 to $455.

A search and comparison of ticket pricing on another reseller website, revealed again, that ticket prices were not being reduced as the event neared. (www.frontrowking.com). On November 12, 2009, this reseller advertised 39 available floor seats to the November 18, 2009 concert ranging in price from $239 to $830. The price of tickets available on November 10, 2009 had not been reduced. On November 17, 2009, the day prior to the concert, two tickets which had previously been advertised for $260 had been increased to a price of $300 per ticket.

It was only after researching ticket pricing on a third ticket reseller website that the Department observed ticket prices being lowered as the November 18, 2009 concert neared. On November 12, 2009, this particular reseller website advertised 35 floor seat tickets to the November 18, 2009 concert ranging in price from $220 to $764. (www.tickets.gruvr.com).   As the event neared, the price of two sets of floor tickets were reduced; one set in  section C2 from $243 to $220 and another set in section B1 from $322 to $240.  The price of all other tickets remained unchanged.

Researching tickets to Cyrus' second New York Concert yielded better results.  On each of three reseller websites visited, the price of some tickets were reduced as the concert date neared.  On November 12, 2009, the following floor tickets were reduced from the price at which they were offered two days previously. One set of tickets located in section A1 was reduced from $402 to $388 and a second in section B1 was reduced from $496 to $471.  The price of other available floor tickets remained unchanged. (www.coasttocoasttickets.com).  A second reseller website advertised several floor tickets on November 12, 2009 for a price reduced from that at which the tickets were offered on November 10, 2009.  One set of tickets in section C1 was reduced from $380 to $265, a second set in section C1 from $390 to $325, a third in section A1 from $410 to $395 and a fourth in section B1 from $545 to $480. (www.frontrowking.com). While some reduction in resale price was observed by the Department, the price at which tickets were being resold to Cyrus' New York concerts, even days prior to the events, far exceeded the price at which these tickets were initially sold.