# EXHIBIT 2

# REPORT ON TICKET RESELLING AND ARTICLE 25 OF THE ARTS & CULTURAL AFFAIRS LAW

**NEW YORK STATE DEPARTMENT OF STATE**
**1 COMMERCE PLAZA**
**ALBANY, NEW YORK 12231**
**518-486-9846**

**HON. LORRAINE CORTÉS-VÁZQUEZ**
**SECRETARY OF STATE**

**February 1, 2010**

follows up with the seller if there is a problem.  Ticketnetwork.com also reported that it utilizes internal policies to restrict fraud and other abuse by ticket resellers, and that it imposes sanctions for violations of this policy, including fines and banning abusive resellers.  Similarly, Ticketmaster reported that it employs protections for consumers on its resale website, Ticketsnow.com, including banning certain resellers from advertising tickets for sale.

## The Current Law

Article 25 of the Arts & Cultural Affairs Law contains the provisions regulating the resale of tickets in New York.  Section 25.01 declares that oversight of the transactions for the purchase of tickets to places of entertainment is a public interest and that enforcement of the article's provision extends to all businesses that sell tickets to entertainment that occurs within New York's boundaries.  Section 25.07 requires that ticket resellers refund the purchase price under certain conditions, such as the cancellation of the event.  Section 25.09 provides that "[a]ny person who in violation of section 25.13 (licensure provision) of this article unlawfully resells or offers to resell or solicits the purchase of any ticket to any place of entertainment shall be guilty of ticket speculation."  Section 25.13 provides for the licensing of ticket resellers by the Department of State.  Website platforms that facilitate ticket resale, but do no engage in the resale itself, are exempted from licensure requirements under section 25.13.[9]

Section 25.17 of the Arts & Cultural Affairs Law permits the Department to request information from licensed ticket resellers and places of entertainment about said licensee or promoter's business, business practices and business methods, when the request is related to a complaint.  The statute does not grant the Department subpoena power or other general authority to compel the production of material and records to monitor the industry.  As such, in preparing this report, the Department was confined by the limited authority given by statute and relied on that material which the Department obtained through its independent research and that which was voluntarily produced by industry representatives.

31, 2007, quoting former Governor Eliot Spitzer.
[9] See, Communications Decency Act, 47 U.S.C. sec. 230.

The Department does not have enforcement jurisdiction over the primary market. While the Department may request information from places of entertainment about the promoter's business, business practice and business methods, its request for such information must be based on and related to a complaint against a licensed ticket reseller.[10] Article 25 of the Arts & Cultural Affairs Law places two primary prohibitions on the primary market. Section 25.30 prohibits operators of places of entertainment who offer season ticket packages and other ticket subscriptions from restricting the resale of tickets. The second limitation on the primary market is found in section 25.09 of the statute which defines 'ticket speculators' to include operator's agents who sell or convey tickets to a secondary ticket reseller owned or controlled by the operator's agent. Violations of section 25.09 are unclassified misdemeanors, prosecuted by the Office of the Attorney General or local law enforcement.[11]

The Department does not have jurisdiction over unlicensed activity, which, pursuant to section 25.35, is a misdemeanor and handled by local law enforcement or the Office of the Attorney General. Section 25.35 also expressly permits consumers to bring private civil actions.

Under Chapter 68 of the Laws of 2009, the Department has been specifically asked to report on the following issues:

(1) The public policy benefit that is furthered by disclosing the number of tickets available for sale to the general public for a particular event;

(2) The harm to the public that results from the practice of ticket speculation, if any, by persons that have access to tickets before the time of initial sale to the general public or at any other time;

(3) A comparison of the availability and cost of tickets in the State with that of other states where price caps in the secondary market are in effect;

(4) The need for better enforcement of existing penalties or the need for greater penalties for violations of this section;

(5) The impact of the use of computer programs and auto-dialing phone systems on the general availability of tickets and the impact of such programs and systems on the ability to purchase blocks of tickets;

---

[10] Arts & Cultural Affairs Law section 25.17.
[11] Arts & Cultural Affairs Law section 25.35.

(6) The feasibility of effective enforcement of ticket selling and reselling by in-state and out of state ticket sellers and resellers;

(7) The public benefit and the public cost of an unregulated secondary market;

(8) The public benefit and usefulness of publishing the average price of tickets for an event after the event takes place; and

(9) The economic impact of the current law on the State.

## SECTION II

**I.   WHAT IS THE PUBLIC POLICY BENEFIT THAT IS FURTHERED BY DISCLOSING THE NUMBER OF TICKETS AVAILABLE FOR SALE AND THE NUMBER OF TICKETS WITHHELD FROM THE GENERAL PUBLIC FOR A PARTICULAR EVENT?**

There exists within the entertainment industry a customary practice of withholding a percentage of tickets from public sale. Commonly known as 'holds', these tickets are reserved for persons and groups such as event promoters, performers, entertainment critics, celebrities and local dignitaries. The number of tickets withheld from general sale varies greatly. It has been reported that at least one-fourth, and perhaps up to three quarters of all tickets are withheld from general sale.[12] For example, it was been reported that for the December 3, 2007 Hannah Montana concert in Kansas City, Missouri, out of 11,000 available seats, only 4,000 were released to the general public. In November 2009, a news report found that out of 13,000 seats to a Taylor Swift concert in Nashville, Tennessee, only 1,600 were set aside for sale to the general public.[13] In another example, for the 2005 World Series, the White Sox baseball team publically stated that "several thousands" of tickets would be made available to the public, but never confirmed the exact number of tickets being released or that "the vast majority of seats were reserved for season ticket holders, Major League Baseball affiliates and others." The limited tickets released for the four home games went on sale to the public at noon through Ticketmaster on October 18, 2005, and sold out within eighteen minutes.[14]

---

[12] Scott D. Simon, If You Can't Beat 'em, Join 'em: Implications for New York's Scalping Law in Light of Recent Developments in the Ticket Business, 72 Fordham L. Rev. 1171, 1176 (2004).
[13] Scalpers, Wealthy Get Great Seats for Taylor Swift, newschannel5.com.
[14] Jonathan Bell, Ticket Scalping: Same Old Problem With a Brand New Twist, 18 Loy. Consumer L. Rev, 435, 2006.