# EXHIBIT 22

Not Reported in F.Supp.2d, 2005 WL 696903 (S.D.N.Y.)
(Cite as: 2005 WL 696903 (S.D.N.Y.))

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Lewis SMALL, Individually and as Trustee of the Richard Small Voting Trust and the American Independent Company Voting Trust, Richard Small, David Wilstein, Leonard Wilstein, Denise Wilstein, Gary Wilstein, Ronald Wilstein and Frederick Gitterman, Plaintiffs,
v.
ARCH CAPITAL GROUP, LTD., American Independent Insurance Holding Company, TDH Capital Partners, TDH III, L.P., Joseph King, William B. Lockhorn and BCI Holdings, Inc., Defendants.

No. 03 Civ. 5604(JFK).
March 24, 2005.

Bragar, Wexler, Eagel & Morgenstern, LLP, New York, New York, Raymond A. Bragar, for Plaintiffs, of counsel.

Indik & McNamara, P.C., Philadelphia, Pennsylvania, Thomas S. McNamara, for Plaintiff, of counsel.

Friedman, Wang & Bleiberg, P.C., New York, New York, Peter N. Wang, Susan J. Schwartz, for Defendants Arch Capital Group, Ltd., American Independent Insurance Holding Company, Joseph King & William B. Lockhorn, of counsel.

Pepper Hamilton LLP, Philadelphia, Pennsylvania, Thomas E. Zemaitis, M. Duncan Grant, Joanna J. Cline, for Defendants TDH Capital Partners and TDH III, L.P., of counsel.

*OPINION and ORDER*
KEENAN, J.
*1 This matter comes before the Court on Defendants' motions to dismiss Plaintiffs' First Amended Complaint (the "Complaint"). Plaintiffs assert a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), as well as common law claims for fraud, specific performance of contract, breach of contract, breach of fiduciary duty, civil conspiracy and intentional infliction of emotional distress.[FN1]

> FN1. Plaintiffs wisely state that they no longer wish to pursue the intentional infliction of emotional distress claim and would stipulate to a voluntary dismissal. (Pl. Mem. at 1 n. 1).

Defendants Arch Capital Group Ltd. ("Arch"), American Independent Insurance Holding Company ("AIIHC"), Joseph King ("King") and William B. Lockhorn ("Lockhorn") (collectively the "Arch Defendants") move to dismiss on statute of limitations grounds, as well as under Fed.R.Civ.P. 9(b), 12(b)(1) and 12(b)(6). To the extent that the Complaint survives the motion, the Arch Defendants move pursuant to Fed.R.Civ.P. 12(f) and Fed.R.Evid. 408 to strike allegations in Paragraphs 114 through 120 of the Complaint on the grounds that they rely upon settlement communications among the parties.[FN2] Defendants TDH Capital Partners ("TDH Capital") and TDH III, L.P. ("TDH III") move to dismiss Counts III through VII insofar as those Counts purport to state claims against them. The TDH Defendants also seek dismissal of Plaintiffs' claims for punitive damages.

> FN2. Pursuant to 15 U.S.C. § 78u-4(b)(3)(B), the Arch Defendants also move to stay discovery and other proceedings pending resolution of their motion. The statute provides that the stay is automatic unless the Court finds that discovery is necessary to preserve evidence or prevent undue prejudice. None of the parties requested such a finding from the Court.

For the reasons that follow, the Court grants the Arch Defendants' motion to dismiss Plaintiffs'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1934 Act claim for failure to satisfy the pleading standards of Rule 9(b). The federal claim having been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining claims and dismisses them for lack of subject matter jurisdiction. These determinations moot the remaining motions.

## BACKGROUND

### I. THE PARTIES

#### A. *Plaintiffs*

The Small and Wilstein Plaintiffs (collectively, the "Stockholder Plaintiffs") are members of the same family and disenchanted former stockholders of Defendant AIIHC. (Compl.¶ 1).[FN3] At the times relevant to this action, Lewis Small was an attorney residing in Pennsylvania and a shareholder in AIIHC, trustee of the Richard Small Voting Trust and trustee of the American Independent Company Voting Trust (the "Trusts"). (*Id.* ¶ 18). Richard Small, Lewis's brother, was a Pennsylvania resident and beneficial owner of the AIIHC shares held by the Trusts. (*Id.* ¶ 19). Richard Small also was a director of AIIHC and AIICO.

> FN3. Citations marked "Compl." are to Plaintiffs' First Amended Complaint.

David and Leonard Wilstein are first cousins of Lewis and Richard. (*Id.* ¶ 54). Denise, Gary and Ronald Wilstein are offspring of David and Leonard, but the Complaint is not clear regarding which children are David's and which are Leonard's. (*See id.* ¶ 54). Lastly, Plaintiff Gitterman was a resident of Pennsylvania at all relevant times and was a director of AIIHC and AIICO from January 1995 to February 28, 2001. (*Id.* ¶ 25).

#### B. *Defendants*

Defendant Arch is a Bermuda company. (*Id.* ¶ 26). AIIHC is a Pennsylvania company that allegedly has been a subsidiary of Arch since February 28, 2001. (*Id.* ¶ 27). AIIHC was the holding company of non-party AIICO, an underwriter of non-standard personal automobile liability and physical damage insurance primarily in Pennsylvania, Delaware and Maryland. (*Id.* ¶ 1). TDH Capital is a Delaware business trust, and TDH III is a Delaware limited partnership. (*Id.* ¶ 28-29). Both TDH entities (collectively "TDH") are headquartered in Pennsylvania. (*Id.*). King was a New Jersey resident who became a director of AIIHC and AIICO. (*Id.* ¶ 30). Lockhorn resided in Pennsylvania and has been president and CEO of AIICO since 1996. (*Id.* ¶ 31). BCI Holdings, Inc. ("BCI") is a Pennsylvania company named as a nominal defendant by reason of its former status as a shareholder in AIIHC. (*Id.* ¶ 32).[FN4] Prior to February 28, 2001, BCI and the Stockholder Plaintiffs owned all of AIIHC's issued and outstanding stock. (*Id.* ¶ 1).

> FN4. Although the caption does not do so, the Complaint refers to BCI as a "nominal defendant." (Compl.¶ 1, 32). Plaintiffs assert that they do not seek recovery from BCI. (*Id.* ¶ 32).

### II. STATEMENT OF FACTS

#### A. *Prologue: The Looting of AIICO*

*2 During the 1990s, non-party Charles M. Lederman ("Lederman"), an actuary and insurance consultant, owned a consulting company called Insurance Financial Services ("IFS"). (*Id.* ¶ 35). In March 1990, AIICO retained IFS to provide operational management services. (*Id.*). Plaintiffs allege that from 1991 to 1995, Lederman and several co-conspirators fraudulently plundered AIICO of millions of dollars. (*Id.* ¶ 38). As these alleged fraudulent acts are merely backstory, the Court will not give a lengthy recitation of the details.

It suffices to say that Lederman's alleged actions bear on the instant litigation in two important ways. First, in 1997, AIICO commenced an action against Lederman and several others in the United States District Court for the Eastern District of Pennsylvania. (*Id.* ¶ 8). In 2000, the Honorable

Robert F. Kelly, U.S.D.J., granted the defendants' motions for summary judgment in part and denied them in part. *Am. Indep. Ins. Co. v. Lederman*, No. CIV.A. 97-4153, 2000 WL 1209371 (E.D.Pa. Aug.25, 2000).[FN5] On May 30, 2001, Judge Kelly ordered the *Lederman* action closed for statistical purposes and placed on the suspense docket. (Compl.¶ 9). Second, Lederman's actions left AIICO in tenuous financial straits. (*Id.* ¶ 54). AIICO's financial situation opened the door to the events that resulted in the initiation of the present litigation.

> FN5. Judge Kelly's Opinion and Order contains a complete recitation of the facts surrounding Lederman's alleged looting of AIICO. *Lederman*, 2000 WL 1209371 at *1-*4.

B. *AIICO Attempts to Pick up the Pieces*

From 1995 to 2000, AIICO tried to survive as a family-owned business by obtaining additional capital from a variety of sources. (*Id.* ¶¶ 54-69). The Wilstein Plaintiffs purchased stock, and AIIHC and AIICO borrowed funds from TDH in exchange for interest-bearing debt obligations and warrants to purchase AIIHC. (*Id.* ¶ 54). In 1996, AIIHC turned to Risk Insurance Capital Reinsurance Company ("Risk Reinsurance") for both reinsurance and additional financial support. (*Id.* ¶ 55). By 2000, Risk Reinsurance had provided approximately $12.1 million in contingent debt financing to AIIHC in return for warrants to purchase AIIHC stock. (*Id.* ¶¶ 59, 62-63). It appears from the Complaint that a series of transactions involving Risk Reinsurance occurred beginning in May 2000. During this time, defendant Arch was incorporated in Bermuda. The parent company of Risk Reinsurance eventually changed its name to Arch Capital Group (U.S.) Inc., and became a wholly-owned subsidiary of Arch. (*Id.* ¶¶ 67-69).

C. *The Lederman Lawsuits and the D & O Claim*

Aside from the *Lederman* case in Judge Kelly's Court, AIICO commenced two other actions (the "State Lawsuits") to recover damages resulting from Lederman's alleged fraudulent actions. (*Id.* ¶ 70). In December 2000, just before execution of the Reorganization Agreement, the State Lawsuits went to binding arbitration. (*Id.* ¶ 76). Plaintiffs allege that Arch knew or had reason to know that AIIHC would not have to incur any substantial additional expenses in prosecuting the State Lawsuits and that only *Lederman* would remain unresolved after arbitration of the State Lawsuits. (*Id.* ¶ 77).

*3 Also ongoing before the agreement was AIIHC's submission of a claim (the "D & O claim") to its directors and officers liability insurance carrier, an affiliate of American International Group ("AIG"). (*Id.* ¶ 75). AIIHC sought to recover approximately $460,000 in attorney's fees incurred in connection with the successful defense of counterclaims asserted against Lewis Small in one of the State Lawsuits. (*Id.*).

D. *The Reorganization Agreement*

On December 31, 2000, the Stockholder Plaintiffs, Arch, AIIHC, BCI and the TDH Defendants entered into a Reorganization Agreement. (*Id.* ¶ 2). Under this agreement, Arch purchased the shares held by the Stockholder Plaintiffs and BCI for $1.25 million in cash, and AIIHC redeemed the remainder of the shares, thereby leaving Arch as the sole shareholder of AIIHC. (*Id.* ¶ 3). The parties agreed that Lewis Small would "assist and manage" the lawsuits on behalf of AIIHC and TDH to the extent his health allowed, and that AIIHC would "continue to fund reasonable fees and reasonable expenses of the Lawsuits ... up to a maximum of $500,000." (*Id.* ¶ 82; Schwartz Aff., Exh. C. § 9.10).

Essentially, Plaintiffs claim that Arch promised to permit AIIHC to continue funding the lawsuits up to $500,000 *after* the closing of the transaction. (Compl.¶ 83). In other words, this $500,000 was over and above (i) any fees and expenses incurred *before* the closing and (ii) any fees recaptured by AIIHC or AIICO from interim proceeds received by AIIHC or AIICO prior to conclusion of all lawsuits. (*Id.*). Any other reading, argue Plaintiffs, makes the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

promise illusory because AIIHC or AIICO already had incurred over $500,000 in fees and expenses from the lawsuits. (*Id.* ¶ 85).

The Reorganization Agreement defines "lawsuits" as "the State Lawsuits together with the Lederman Lawsuits and any other lawsuits or other actions which may arise out of or be in relation to or in connection with such lawsuits, whether or not involving the same claims or facts based on similar claims." (Schwartz Aff., Exh. C. § 1). Plaintiffs contend that, under this definition, the term "lawsuits" embraces the D & O claim. (*See* Compl. ¶ 86).

E. *The Agreement Falls Apart*

Aside from the D & O claim, the sole remaining lawsuit in which Plaintiffs have a financial interest is the *Lederman* case before Judge Kelly. (*Id.* ¶ 8). Plaintiffs accuse Arch and the other Defendants of mismanaging *Lederman* and the D & O claim, to Plaintiffs' detriment, in several different fashions.

1. The Exclusion of Lewis Small

Plaintiffs allege that the Defendants violated Lewis Small's right under Section 9.10 of the agreement to manage *Lederman*. Plaintiffs contend that Lockhorn, on behalf of Arch, AIICO and TDH, "repeatedly hounded" Small for weekly status reports and a time line of key events (even though there was nothing to report) and "chastised" Small for being "delinquent" in providing them. (*Id.* ¶ 99). Plaintiffs claim that these actions were an attempt to coerce Small into relinquishing his role as manager of the lawsuits. (*Id.* ¶ 100). On May 25, 2001, Lockhorn sent a memorandum to Lewis Small that criticized his management of *Lederman* and concluded that one way around the problems would be for Small to turn over management of the case to Lockhorn "or someone else Arch would prefer." (*Id.*). Small declined the suggestion, but requested that AIIHC and AIICO provide additional administrative support. (*Id.* ¶ 101).

*4 From June to November 2001, Lewis Small communicated in writing his specific concerns about the handling of *Lederman* by AIICO's lead counsel, Willam F. Kuntz ("Kuntz"). (*Id.* ¶ 102). Arch did not support Small's recommendations concerning Kuntz and allegedly made other strategic decisions concerning *Lederman* that Small strongly opposed. (*Id.* ¶ 103-04). In November 2001, Lewis Small recommended to Arch that Kuntz be replaced. (*Id.* ¶ 105). Lockhorn insisted that AIIHC retain another attorney, Joseph M. O'Neill ("O'Neill") for a second opinion. (*Id.* ¶ 106). Plaintiffs allege that this action deliberately delayed *Lederman* and unnecessarily expended funds that would have been available for that lawsuit. (*Id.*). On January 11, 2002, a TDH representative informed Small that TDH would approve no change in counsel unless Small agreed to a "modification" of his role that essentially would render Lockhorn the manager and Small as a participant. (*Id.* ¶ 107).

On January 24, 2002, O'Neill recommended that AIICO discharge Kuntz immediately. (*Id.* ¶ 108). Over two months later, after repeated written and oral requests by Small, AIIHC permitted AIICO to discharge Kuntz without first retaining substitute counsel. (*Id.*). Small repeatedly recommended the retention of other counsel, but Lockhorn eventually informed him that the $500,000 in funding committed by AIIHC had been exhausted. (*Id.* ¶ 109). Lockhorn advised that unless the Stockholder Plaintiffs were willing to negotiate a new agreement, AIICO would not be able to retain counsel except on a contingency basis. (*Id.*). The Complaint does not specify exactly when Lockhorn told Small that the $500,000 was exhausted.

2. Problems with Arch's $500,000 Commitment

In December 2001, AIIHC issued letters and a statement to the Stockholder Plaintiffs summarizing an interim distribution to be made from net proceeds generated in connection with the State Lawsuits. (*Id.* ¶ 110). This statement ("First Expense Statement"), listed expenses of $307,151.86 in the column "Post Acquisition Paid or Incurred." (*Id.* ¶ 111). On January 7, 2002, Lockhorn informed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 696903 (S.D.N.Y.)
(Cite as: 2005 WL 696903 (S.D.N.Y.))

Small that there was approximately $200,000 remaining to satisfy AIIHC's $500,000 funding obligation. (*Id.* ¶ 112). Plaintiffs come to the obvious conclusion (which must have been apparent at the time) that Arch and AIIHC were crediting the $307,151.86 against the $500,000 obligation. (*Id.*). This action is improper, Plaintiffs say, because AIIHC recaptured 100% of these expenses from proceeds received in connection with the lawsuits, and half of the expenses were incurred *before* the closing of the Reorganization Agreement. (*Id.* ¶ 113). Plaintiffs also contend that many of these expenses had nothing to do with *Lederman* or any other lawsuit. One such expense was $42,990.91 expended by AIIHC to retain counsel to represent its interests in an FBI investigation of Lederman's activities. (*Id.* ¶ 114).

*5 After discussing the First Expense Statement, the Complaint inexplicably vaults forward fifteen months to April 2003, when AIIHC provided the Stockholder Plaintiffs with a revised financial statement ("Second Expense Statement") recapping expenses as of March 31, *2002.* (*Id.* ¶ 115). In this statement, which listed expenses at $601,832.50, AIIHC claimed that it had fully satisfied its $500,000 post-closing obligation. (*Id.* ¶¶ 115-16). The statement also showed increased expenditures for the FBI counsel, Kuntz and other vendors. (*See id.* ¶ 117).

Ultimately, Plaintiffs allege that the exclusion of Lewis Small and Arch's improper calculations were manifestations of Defendants' intent to permanently abandon *Lederman* to the suspense docket of the Eastern District of Pennsylvania. (*Id.* ¶ 9). Plaintiffs ascribe as the motive for these actions a supposed relationship between Arch and Rockwood Casualty Insurance Company ("Rockwood"), one of the *Lederman* defendants. (*Id.* ¶¶ 37, 125). According to Plaintiffs, Rockwood is one of the few defendants in *Lederman* with the assets available to satisfy an adverse judgment. (*Id.* ¶ 125). Plaintiffs allege that Arch and Rockwood were involved in a "series of direct or indirect potential, if not actual, business relationships" in which Rockwood was a potential client of Arch or affiliates of Arch. (*See id.*). Plaintiffs claim that Arch's financial motive to avoid litigation against Rockwood existed at the time the Reorganization Agreement was executed. (*Id.* ¶ 127).

3. The D & O Claim
Plaintiffs assert that the $460,000 D & O Claim resulted from the successful defense of a counterclaim against Lewis Small in the State Lawsuits. (*Id.* ¶¶ 75, 124). Plaintiffs claim, however, that Arch had the motivation to prevent AIIHC from pursuing the D & O claim. (*Id.* ¶ 121). Plaintiffs believe that AIG, the underwriter of the directors and officers insurance policy, or one of AIG's parents or affiliates, held a substantial ownership interest in Arch. (*Id.* ¶ 122). Plaintiffs base this belief on "letters sent by Joseph B. Timoney, Jr., a Vice President of AIICO to ... Gitterman, indicating that AIG owned up to a 20% interest in Arch." (*Id.* ¶ 123). There is some dispute over the 20% figure. In one letter, Mr. Timoney informed Gitterman that "[t]o the best of our knowledge AIG does not own more than a 10% interest in Arch Capital Group, Ltd." (Schwartz Aff., Exh. D). Regardless, Plaintiffs claim that they had no knowledge of AIG's ownership in Arch at the time they entered into the Reorganization Agreement. (*Id.* ¶ 124).

*DISCUSSION*
I. RULE 12(b)(6) STANDARD
On a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court's task is to assess the legal feasibility of the claim rather than to weigh the evidence that might be offered in support thereof. *See, e.g., Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). Accordingly, the Court accepts Plaintiffs' factual allegations as true and draws all reasonable inferences in Plaintiffs' favor. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). Defendants' motion will be granted only if it appears beyond doubt that Plaintiffs can prove no set of facts in support of their claim would entitle them to relief. *See Sweet v. Sheahan,* 235

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 696903 (S.D.N.Y.)
(Cite as: 2005 WL 696903 (S.D.N.Y.))

F.3d 80, 83 (2d Cir.2000).

*6 In deciding a Rule 12(b)(6) motion, the Court is not permitted to "search the record." Instead, the Court assesses the complaint, any documents attached to the complaint as exhibits, any documents or statements incorporated into the complaint by reference and any "integral" documents upon which the complaint relies. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995). An obvious example from the instant case is the Reorganization Agreement.

## II. COUNT I: SECURITIES FRAUD

### A. *Section 10(b) and Rule 10b-5*

Plaintiffs assert their federal securities fraud claim against Arch alone. Under Section 10(b) of the 1934 Act, it shall be unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). Rule 10b-5 similarly makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

To state a claim for a violation of Section 10(b) and Rule 10b-5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000).

The plaintiff also must satisfy the heightened pleading standards of Fed.R.Civ.P. 9(b) and the Private Securities Reform Litigation Act of 1995 ("PSLRA"). Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

FN6 To state a claim with the required particularity, a complaint "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (citation omitted).

> FN6. The PSLRA provides that where the plaintiff alleges that the defendant made a misstatement or omission of material fact, "the complaint shall specify each statement alleged to have been misleading, the reason why it was misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1).

### B. *Statute of Limitations*

The Arch Defendants go for the kill at the outset by contending that Count I is time-barred under the one-year statute of limitations in Section 9(e) of the 1934 Act. The Arch Defendants contend that Plaintiffs were on constructive notice of facts suggesting a probability of fraud as early as February 2001, when Defendants allegedly attempted to erode Small's management of *Lederman.* (Arch Def. Mem. at 24-25). Plaintiffs did not file their Complaint until July 28, 2003.

Section 9(e) provides that an action must be brought "within one year after the discovery of the facts constituting the violation." 15 U.S.C. § 78i(e). The limitations period begins to run "when the plaintiff obtains actual notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992). In other words, "[w]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993). These

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

circumstances are known as "storm warnings." *See LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 154 (2d Cir.2003).

*7 The determination of when a plaintiff receives inquiry or constructive notice is "often inappropriate for resolution on a motion to dismiss." *Id.* at 156 (citation omitted). On the other hand, "[w]here ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers ... integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *Dodds,* 12 F.3d at 352 n. 3.

On the record before it, the Court cannot say with certainty that Plaintiffs were on constructive notice of the probability of fraud in 2001. True, Small believed that Lockhorn and others were minimizing his management role throughout most of that year. Nevertheless, Defendants' alleged demands for weekly reports, timesheets and the presence of a TDH representative at meetings concerning *Lederman,* not to mention other examples of "hounding," hardly qualify as indications of probable fraud.

In December 2001, Plaintiffs received the First Expense Statement, which showed expenditures of approximately $307,000. On January 7, 2002, Lockhorn told Small that $200,000 of the $500,000 balance remained. Perhaps this was first indication that fraud was afoot, but the Court need not decide the issue. Even assuming *arguendo* that Plaintiffs were on constructive notice in January 2002, their claim would not be time-barred even though the Complaint was filed more than one year later. The enactment of the Sarbanes-Oxley Act on July 30, 2002 extended the one-year limitations period in Section 9(e) to two years for "all proceedings ... commenced on or after the date of enactment of this Act." 28 U.S.C. § 1658(b); Pub.L. No. 107-204, § 804(b), 116 Stat. 745, 801 (2002).FN7 While the enactment of Sarbanes-Oxley would not revive a claim that was already time-barred under Section 9(e), *In re Enterprise Mortgage Acceptance Co., L.L.C. Sec. Litig.,* 391 F.3d 401, 403 (2d Cir.2004), Plaintiffs' claim was still alive when Sarbanes-Oxley was enacted in July 2002. Plaintiffs therefore get the benefit of the extra year in Sarbanes-Oxley, and their July 28, 2003 Complaint is timely.

> FN7. The limitations period in Sarbanes-Oxley applies to any private right of action involving "a claim of fraud, deceit, manipulation or contrivance in contravention of a regulatory requirement concerning the securities laws." 28 U.S.C. § 1658(b).

C. *Adequacy of Pleading*

1. Material Omission: Intent Not to Perform

The crux of Plaintiffs' securities fraud claim is that "on information and belief ... at the time Arch made the specific promises to the Selling Shareholders regarding the Lawsuits and the D & O Claim, as reflected in ... the Reorganization Agreement, regarding the management and continued funding of the fees and expenses of the Lawsuits, Arch had no intention to perform, and secretly intended not to perform, such promises." (Compl.¶ 131). Plaintiffs allege that they would not have sold or transferred their stock in AIIHC per the Reorganization Agreement had they known of Arch's actual intentions." (*Id.* ¶ 139). The Arch Defendants contend that this claim must be dismissed because, among other reasons, it is nothing more than a breach of contract claim masquerading as a Section 10(b) claim. (Arch Def. Mem. at 36).

*8 While "[t]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract," *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993), "[m]aking a specific promise to perform a particular act in the future while secretly intending not to perform may violate Section 10(b) ... if the promise is part of the consideration for a sale of securities." *Pross v. Katz,* 784 F.2d 455, 457 (2d Cir.1986). In situations involving allegations of nonperformance

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

under a contract, the Second Circuit has adopted a clear scienter requirement: "fraudulent intent may only be inferred 'when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident.' " *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 664 (2d Cir.1997) (quoting *Powers v. British Vita, P.L.C.,* 57 F.3d 176, 185 (2d Cir.1995)). Remarkably, the briefs on this motion fail to cite *Campaniello Imports* or *Powers.*

In order to take shelter beneath the umbrella of Sarbanes-Oxley's extended limitations period, Plaintiffs must contend that the key events putting them on notice of the probability of fraud did not occur until months after the closing of the transaction. In so doing, they argue themselves out of court with respect to *Campaniello Imports* and *Powers:*

> While knowledge that defendant Lockhorn was making Small's life difficult and attempting to interfere with or minimize his role in the management of the Lawsuits may arguably have constituted constructive notice that Arch and [AIIHC] were then breaching their respective contractual obligations, or perhaps even violating their fiduciary duties, constructive notice of such present breaches of contract or fiduciary duties are not, as Arch seems to suggest, the equivalent of constructive notice that the underlying contract had been fraudulently induced in the first place. *In particular, none of the events plead* [sic] *in the Amended Complaint as having occurred between the period between February 28, 2001 and June 30, 2001 suggested the probability that Arch secretly intended not to ever perform its obligations when it executed the Agreement.*

(Pl. Mem. at 35) (emphasis added). The Court finds it impossible to reconcile this argument (particularly the emphasized section) with the rule that fraudulent intent is *only* inferred when the violation of the agreement is so *malicious* and so *soon* after it is made that the defendant's secret intent to violate the agreement is *evident.* As Plaintiffs themselves represent, none of Defendants' acts between February 28, 2001 and June 30, 2001 suggested the probability of a secret intent not to perform. Consequently, the Court looks to events that occurred subsequent to June 30, 2001.

On July 26, 2001, Small attended a meeting to discuss *Lederman.* The Complaint alleges that Small "expressed his strong disagreement with certain of the decisions purportedly made by the group at the meeting." (Compl.¶ 104). This allegation does not even lead to an inference of a breach of contract, let alone a malicious violation. On November 19, 2001, Small recommended that Kuntz be replaced as counsel on *Lederman.* (*Id.* ¶ 105). The Complaint alleges that AIIHC and Arch "failed and refused to timely approve or otherwise act upon [this] recommendation." (*Id.* ¶ 106). As before, not only were AIIHC and Arch's actions here not malicious, they were barely (if at all) a breach of contract. Under the Agreement, Small was not permitted to replace counsel unilaterally. FN8

> FN8. Section 9.10 of the Agreement, which discusses Small's management of the Lawsuits, explicitly states that "the prior written approval of [AIIHC] and TDH will be required for any strategic decisions relating to the Lawsuits, including ... the selection and removal of legal counsel."

*9 The next allegations concern the December 2001 "First Expense Statement" and the January 7, 2002 meeting concerning Lockhorn's application of the $307,000 on the Statement to the $500,00 balance (discussed *supra* at pp. 10-11). Even if these allegations lead to an inference of malice (a debatable proposition at best), these events occurred over ten months after the Agreement closed. They were hardly "so soon after" the Agreement that a secret intent not to perform from the outset is evident. For the Court to so hold would be to ignore the clear language of *Campaniello Imports* and *Powers.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Court therefore finds that Plaintiffs fail to adequately allege scienter with respect to Defendants' alleged secret intent not to perform their obligations under the Reorganization Agreement. The Court now turns to the other potential omission of material fact: the relationship between Arch and AIG with respect to the D & O claim.

2. Material Omission: The D & O Claim

Plaintiffs allege, upon information and belief, that Defendants failed to disclose that AIG-the insurance underwriter responsible for payment of the D & O Claim-held an ownership interest in Arch up of to 20%. (*See* Compl. ¶ 123).[FN9] Plaintiffs contend this fact "made it substantially less likely that [AIIHC] would continue to actively pursue or litigate its claim to recover from AIG the approximately $460,000 in legal fees" that AIIHC had paid in defending the counterclaim against Small. (*Id.* ¶ 124).

> FN9. As stated *supra,* p. 12, there is a dispute as to extent of AIG's interest in Arch.

Once again, the Court finds that Plaintiffs have failed to adequately allege scienter. Prior to enactment of the PSLRA, the pleading standard for scienter was as follows:

[P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent. The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000) (internal quotation marks omitted) (citing *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995)). The Second Circuit has held that the enactment of the PSLRA merely "raised the nationwide pleading standard to that previously existing in this circuit" and "did not change the basic pleading standard for scienter in this circuit." *Id.* at 310.

The Complaint alleges that Arch's "motive" for causing AIICO to dawdle on the D & O claim was "the fact that, on information and belief, the underwriter of AIICO's Directors and Officers Liability Insurance, American International Group [AIG], or one of its corporate parent or affiliate [sic], also then held a substantial ownership interest, directly or indirectly, in Arch itself." (Compl.¶ 122). This vague allegation does not pass muster under Second Circuit and PSLRA pleading standards. "Motive would entail *concrete* benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994) (emphasis added). Plaintiffs make no effort to demonstrate that Arch, AIIHC or any other defendant received a concrete benefit from any alleged failure to pursue the D & O Claim.

*10 Plaintiffs also fail to allege conscious misbehavior or recklessness on Arch's part. Conscious misbehavior is defined as "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information ... or knowing sale of a company's stock at an unwarranted discount." *Novak,* 216 F.3d at 308. There is no allegation of any evidence of deliberate illegal behavior on Arch's part, so the focus turns to recklessness. Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks omitted). Parties state a claim based on recklessness, for example, "when they have specifically alleged defendants' knowledge of facts or access to information contradicting public statements." *Id.* Plaintiffs make no such allegation here. Instead, the Complaint states only that Arch caused AIIHC and AIICO "to refrain from actively pursuing and litigating the D & O Claim." (Compl.¶ 122). This alleg-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ation, standing alone, does not lead to an inference that Arch engaged in "highly unreasonable" conduct that was an "extreme departure from the standards of ordinary care." In actuality, the Complaint gives the Court no clue as to how Arch misbehaved with respect to its handling of the D & O Claim.

The Court therefore dismisses Count I of the Complaint under Rule 9(b). The Arch Defendants contend that this result mandates dismissal of the entire Complaint because none of the remaining claims involve federal law or diversity of citizenship. (Arch Def. Mem. at 38; see Compl. ¶¶ 13-14, 17). The Court agrees. Having dismissed the securities fraud claim against Arch, the Court declines to exercise supplemental jurisdiction over the remaining causes of action. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over [related state claims] if ... the district court has dismissed all claims over which it has original jurisdiction."); *Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir.1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Counts II through VII are dismissed as to all defendants.

The Arch Defendants urge that leave to replead be denied, citing *In re Champion Enter., Inc. Sec. Litig.*, 145 F.Supp.2d 871, 873 (E.D.Mich.2001) for the proposition that the PSLRA does not contemplate the amending of complaints. (Arch Def. Mem. at 35-36). While the Court agrees that repeated amending under Fed.R.Civ.P. 15(a) would frustrate the purposes of the PSLRA, Plaintiffs are allowed one more chance to clear the Rule 9(b) and PSLRA pleading hurdle.

### CONCLUSION

For the foregoing reasons, the Arch Defendants' motion to dismiss Plaintiffs' Complaint in its entirety is granted. This determination moots all other motions pending before the Court. Plaintiffs are granted leave to replead and shall file and serve a Second Amended Complaint no later than April 15, 2005. Should Plaintiffs fail to timely serve and file an amended complaint, the Court will dismiss this action with prejudice.

*11 SO ORDERED.

S.D.N.Y.,2005.
Small v. Arch Capital Group, Ltd.
Not Reported in F.Supp.2d, 2005 WL 696903 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.